Edward C. ROBILLARD, Plaintiff,

v.

A. L. BURBANK & CO., LTD., and
Terminal Steamship Company,
Defendants.

Civ. No. 137-16.

United States District Court
S. D. New York.

July 21, 1960.

Jacob Rassner, New York City, for
plaintiff.

Dougherty, Ryan & Mahoney, New York City (Robert M. Pellegrino, New York City, of counsel), for defendants.

FRIENDLY, Circuit Judge (sitting by designation).

## I. Jurisdiction.

This action was brought by plaintiff Robillard, a longshoreman, against A. L. Burbank & Co., Ltd., and Terminal Steamship Company, owner of the S.S. Lumber Carrier. By stipulation the action was discontinued as to defendant Burbank. Plaintiff sought damages for injuries sustained while working on a dock at Bridgeport, Connecticut, as a result of being struck by a piece or pieces of lumber during the unloading of the Lumber Carrier by plaintiff's employer, Cilco Terminal Company.

The complaint invoked the jurisdiction of this court on the basis of diverse citizenship, 28 U.S.C. § 1332. It alleged "that the plaintiff is a resident of the State of Connecticut" and the plaintiff testified to that effect. Technically this method of alleging citizenship is not sufficient, see Realty Holding Co. v. Donaldson, 1925, 268 U.S. 398, 45 S.Ct. 521, 69 L.Ed. 1014; however, this need not be considered in view of what follows. The complaint also alleged that Terminal Steamship Company "was a foreign corporation and having a principal place of business within the jurisdiction of this Court". It was stipulated that Terminal is a Delaware corporation; hence, subject to the technical and curable defect in the allegation of Robillard's Connecticut citizenship, diversity would have been made out as 28 U.S.C. § 1332 stood before its amendment by the Act of July 25, 1958, 72 Stat. 415, providing that "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." However, the allegation that defendant has "a principal place of business within the jurisdiction of this Court" did not negative that defendant's principal place of business may have been Connecticut; therefore the allegation of diversity jurisdiction was insufficient, quite apart from any question as to the effect of defendant's denial of the allegation as to place of business.

On the other hand, the complaint does set forth a claim of admiralty or maritime jurisdiction, 28 U.S.C. § 1333, even though the injury occurred on shore, 46 U.S.C.A. § 740. At the conclusion of the case plaintiff's counsel made a "motion to transfer this case from the civil side of the court to the admiralty side"; while he later withdrew this motion, this was done under what the Court now considers an excusable misapprehension as to the effect on diversity jurisdiction of a lack of proper allegation as to defendant's principal place of business. Judge Learned Hand said, in Prince Line, Ltd. v. American Paper Exports, Inc., 2 Cir., 1932, 55 F.2d 1053, 1056, "When a cause of action is within the substantive jurisdiction of the District Court for any reason, it does not mar that jurisdiction that the suitor proceeds as libelant in the admiralty rather than as plaintiff at law." There appears to be no reason why the converse should not be equally true when, as here, plaintiff waived his demand for jury trial, the case was tried and briefed on claims of unseaworthiness and negligence, and the only admiralty elements lacking were the labels on the pleadings and the silver oar. See United States ex rel. Pressprich & Son Co. v. James W. Elwell & Co., 2 Cir., 250 F. 939, certiorari denied, 1918, 248 U.S. 564, 39 S.Ct. 8, 63 L.Ed. 423; United States v. The John R. Williams, 2 Cir., 144 F.2d 451, 454, certiorari denied Great Lakes Dredge & Dock Co. v. United States, 1944, 323 U.S. 782, 65 S.Ct. 271, 89 L.Ed. 625; Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 2 Cir., 1956, 234 F.2d 253, 257, fn. 5; Currie, The Silver Oar and All That: A Study of the Romero Case, 27 U.Chi. L.Rev. 1, 6–7, 23–40 (1959).

## II. The Accident.

There is no real dispute as to the cause of the accident. A deposition by Crenshaw, second mate of the Lumber Car-

rier, stated substantially as follows: The vessel had been loaded with lumber at various ports in Washington and Oregon. Some of the lumber was loaded on the deck to a height of approximately 10 feet. The deck cargo was handstowed fore and aft with chain lashings and with lath running athwartships. In the mate's opinion the stowage was proper. The vessel encountered no heavy weather on its voyage through the Panama Canal to Bridgeport, the cargo rode well during the voyage and the deck load was under daily inspection. The Lumber Carrier arrived at Bridgeport during the night of August 25–26, 1957. Her port side was moored next to the Cilco Terminal Co. dock. Discharge operations by Cilco, Robillard's employer, began on August 26 shortly after 8 A.M. In discharging the deck cargo at No. 2 hatch, the stevedores started building the loads from the center of the vessel. Crenshaw did not consider this a proper method of discharging the deck cargo "because when those loads are passing over the cargo that's left standing there, it is apt to knock it off, knock it off the dock." The ship's winches, which were manned by the stevedores, were operating properly. The drafts of lumber being made up by the stevedores were very large. Crenshaw remonstrated about this, fearing that the heavy loads might damage the gear; the stevedores answered him "Ya ya". He reported his dissatisfaction with the stevedores' procedures to the first officer who was also on deck watching the unloading; the first officer talked to the stevedores but Crenshaw did not know what was said. In any event the stevedores' methods were not changed. Shortly after 1 o'clock a draft of lumber going over the side of the vessel knocked several pieces of deck cargo loose. The stevedores looked at this and discussed the situation but did not straighten up the deck load. The next load hit the loose pieces and knocked them off. Most of them fell into the water, but some hit the dock. Crenshaw saw a man on the dock who appeared to have been hit; Cilco's walking boss went from the Lumber Carrier down to the dock and took the man away. Thereafter unloading continued during the afternoon, apparently using the same method as before. Crenshaw further testified that stevedores insist upon doing the entire unloading operation; that the deck officers watch "and when we see it's not going right, we try to get them to do it right" and "if it gets too bad we turn the steam off on them" but that hadn't been done here "because it wasn't that bad."

The testimony of Robillard and his "partner", Reynolds, made it evident that Robillard was the man on the dock whom Crenshaw saw. Neither was able to add anything as to the cause of the accident. Reynolds saw lumber falling from the ship and tried to get out of the way, with partial success; when he looked around, he "saw Robillard laying on his stomach with 10 or 12 boards covering him." Robillard saw even less; he had been working with his back to the ship. The evidence as to the nature and extent of Robillard's injuries will be discussed in section IV below.

### III. Liability.

A. *Unseaworthiness*. It would have been a bold man who would have asserted fifteen years ago that a longshoreman, working on land, might recover from a shipowner on a warranty of seaworthiness for an injury caused by a dangerous condition created on the ship by the active negligence of his own employer. However, binding authority seems to have forged each link in a chain leading to this, to me, still surprising conclusion.

The first link, of course, is Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, deciding that a longshoreman injured aboard ship can recover damages for unseaworthiness from a nonnegligent shipowner. Strika v. Netherlands Ministry of Traffic, 2 Cir., 1950, 185 F.2d 555, certiorari denied, 1951, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343, held the reasoning of Sieracki and other cases compelled the conclusion that a longshoreman injured ashore could

likewise recover for unseaworthiness, in an accident that occurred before enactment of 46 U.S.C.A. § 740, see 64 Harv. L.Rev. 996, 997 (1951), and the Ninth Circuit embraced this view even in a case that did not require it to do so, Pope & Talbot, Inc. v. Cordray, 1958, 258 F.2d 214, 218. Cf. Fredericks v. American Export Lines, Inc., 2 Cir., 1955, 227 F.2d 450, certiorari denied, 1956, 350 U.S. 989, 76 S.Ct. 475, 100 L.Ed. 855, where the injury was caused by the breaking of a skid on the pier. The third link is forged by Alaska SS Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming *per curiam* the Ninth Circuit's decision, 1953, 205 F.2d 478, holding a shipowner liable for unseaworthiness to an employee of a stevedoring company for injury caused by the breaking of a block assumed to have been brought on the vessel by the plaintiff's employer—a decision which, as Judge Clark immediately pointed out in Berti v. Compagnie de Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397, 400, invalidated many of the Second and Third Circuit decisions on "relinquishment of control" as applied to unseaworthiness on which defendant here relies. See Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Corn.L.Q. 381, 411–412 (1954); Gilmore & Black, The Law of Admiralty, pp. 324–328. Alaska SS Co. v. Petterson did involve defective gear although why that should make a difference when the gear was not the ship's and the defect was not known to the owner, would be hard to see. In any event the final link seems to have been supplied by Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, reversing the First Circuit's decision that with respect to "an unseaworthy condition which arises only during the progress of the voyage", the shipowner's obligation "is merely to see that reasonable care is used under the circumstances * * * incident to the correction of the newly arisen defect", 265 F.2d at page 432, and holding that Alaska SS Co. v. Petterson "effectively disposes of the suggestion that liability

for a temporary unseaworthy condition is different from the liability that attaches when the condition is permanent." 362 U.S. at page 550, 80 S.Ct. at page 933.

All that needs be done here is to substitute longshoreman Robillard for crewman Mitchell and the dangerous condition of the deck load created by Cilco on the Lumber Carrier for the slime and fish gurry left from the unloading of the Racer by its crew. Sieracki and Strika teach the first substitution and Petterson seems to demand the second. Indeed, precisely this conclusion appears to have been reached, without benefit of Mitchell, in Judge Learned Hand's opinion in Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, 922, holding that "enough time had elapsed" from the installation of a wrong hatch cover by plaintiff stevedore and his coworker "to result in unseaworthiness". Here the unsafe method of unloading the lumber "building up the loads from the center of the vessel, making a big hole in the cargo, right in the center, leaving the outside stand up, built up" had begun shortly after the stevedores boarded the vessel around 8 A.M.; the accident did not happen until after 1 P.M. The case thus is governed by Grillea v. United States, supra, rather than by Titus v. The Santorini, 9 Cir., 1958, 258 F.2d 352, where the Ninth Circuit held Alaska SS Co. v. Petterson inapplicable to "instantaneous acts" of stevedores rendering the equipment unseaworthy.

B. *Negligence.* Since an appellate court may find the logic of these authorities less ineluctable than it seems to me, I shall make findings with respect to plaintiff's alternative claim as to negligence.

Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143, decided that a stevedore may recover against a shipowner for negligence. The reasoning of Strika v. Netherlands Ministry of Traffic, supra, and 46 U.S.C.A. § 740, establish that an action for such recovery by a longshoreman injured ashore is of admiralty and maritime jur-

isdiction. The question is thus whether the shipowner was negligent in failing to require Robillard's employer to desist from the unloading procedures that caused the accident. I find it was not.

I would not suppose the unloading of a ship constituted work "involving a peculiar risk of bodily harm to others unless special precautions are taken" as to which the American Law Institute, Restatement of Torts, § 416, says that one who employs an independent contractor "is subject to liability for bodily harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions."—even if we were to assume that the statement meant to include employees of the independent contractor as "others", and would be supportable if it did. See also 2 Harper & James, The Law of Torts, § 26.11, at pp. 1408–1409, and cases cited. Here the shipowner did not specify the use of a procedure dangerous unless adequate precautions were taken, as in United New York and New Jersey Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541. It simply hired Cilco to unload the ship, and there is no claim that Cilco was not qualified to do this. Hence the shipowner could not be held liable to Robillard for negligent unloading of the cargo by Cilco if the ship's officers had remained below or gone ashore. Gallagher v. United States Lines Co., 2 Cir., 206 F.2d 177, 179, certiorari denied, 1953, 346 U.S. 897, 74 S.Ct. 221, 98 L.Ed. 398; Berti v. Compagnie de Navigation Cyprien Fabre, supra, 213 F. 2d at page 400.

The question is how far a different result is demanded here because the ship's officers saw the improper procedures being used by the stevedoring company. Their observation of the unloading was primarily for the purpose of protecting the ship's gear from injury rather than of seeing to it that the stevedoring company acted prudently as to its own employees. However, when Crenshaw saw the unloading was being performed in what he regarded as an improper manner, he remonstrated to the stevedores and, after he had received a brush-off, the first officer repeated the remonstrance without effect. The only step left to the officers was to turn off the steam and thereby interrupt the entire unloading process. Crenshaw thought such a response exaggerated in reference to the apparent risk. I do not find this an unreasonable assessment. The unloading had proceeded normally all during the morning and apparently did so again in the afternoon. There is no evidence that the interval between the dislodging of lumber by one draft and the fall on the next was long enough to enable the ship to take any effective action, assuming, without deciding, that it became bound to do so then although not before. I do not say that a verdict finding defendant negligent would have to be set aside; as trier of the fact I do not find it so.

## IV. Damages.

Robillard testified that, when the lumber hit him, "the lights went out—I just don't know what happened. All of a sudden I found myself laying on the dock on my face, pushed almost into the dock and it seemed like I could hear fellows murmuring and it seemed like an eternity to me before they got these things off me * * *." After the lumber was removed, he did not feel any pain and thought he was all right. Fellow employees thought differently. He was examined on the dock by a doctor retained by Cilco's insurance carrier, then taken to the doctor's office and, over objection, to the Bridgeport Hospital. He was hospitalized for 13 days, during part of which he was not fully aware of occurrences. The hospital's final diagnosis was "probable skull fracture, cerebral concussion, multiple contusions". He was hospitalized twice thereafter, in December, 1957 at the West Haven Veterans' Hospital and in November, 1958, at the Milford Hospital, the latter for an operation for the removal of ganglianeuroma which had appeared on the right wrist a month or so after the accident.

Robillard testified that he endeavored to resume work as a longshoreman in late October, 1957 but was unable to continue because of severe pain over his back and head; shortly he repeated the experiment with the same results. He tried to engage in oystering in the fall of 1957 and at various periods in 1958 and in clamming in 1959. He claimed that after brief exertion he would suffer pain to an extent requiring cessation of activity. He said he also suffered severe back pain when attempting to paint his kitchen and has had dizzy spells which on at least one occasion caused him to fall.

Plaintiff called as medical witnesses a Milford, Connecticut, surgeon who had treated him since 1957, and a New York neurologist who examined him a fortnight before the trial. The surgeon testified that the fall of the lumber had caused a concussion of the brain which continued to affect Robillard and myositis of the neck muscles as well as injuries to the back. He thought the combination of these injuries would disable Robillard from ever doing any useful work. The neurologist also concluded that Robillard had suffered a cerebral concussion and injuries or sprains of the neck and back which had left residual symptoms. In his opinion it was probable that the symptoms would continue although he frankly admitted that no one could be absolute about this. So long as the symptoms did continue, Robillard, in his opinion, was disqualified for manual labor; however, he thought there were sedentary jobs that Robillard might perform.

Defendant submitted reports of a neurologist, an orthopedist, and a roentgenologist, who had examined Robillard in May, 1959. The roentgenologist's report was negative with exceptions not here material. The neurologist gave Robillard a battery of tests, all of which proved negative; he stated "there are subjective complaints regarding his head and back but no objective findings" and concluded that Robillard "should be able to resume his normal occupation" subject only to "a mild partial disability to his right wrist." The orthopedist found no evidence of muscle spasm, which plaintiff's neurologist did find in the lower lumbar region. Although noting that Robillard complained of pain in the lumbar region and the cervical area, he found Robillard was not orthopedically disabled.

Reconciliation of this testimony presents the usual difficulties. The court had the benefit of seeing Robillard and plaintiff's medical witnesses but not defendant's. I find that as a result of the accident Robillard suffered injuries which have continued up to this time, that there is a probability of their continuance in the same or less degree, but that his disability is and has been partial rather than total. While Robillard's attempt to resume longshoring at the outset is understandable, his failure for nearly three years to make any attempt to obtain a gainful occupation involving less physical effort than oystering and clamming is not. I cannot accept the view that no possibilities of such employment exist for an obviously intelligent man who is a high school graduate, and has had some business and union experience.

For the four full years preceding the accident Robillard's earnings from longshoring averaged some $5,000. On this basis his earnings from the date of the accident to the date of judgment would have been some $14,500. His actual earnings have been $1,433.75. However, I am not convinced that Robillard could not have earned more once it had become apparent that selection of a less strenuous occupation was indicated. I shall allow $9,500 for loss of earnings to the date of judgment.

Robillard will be 57 on December 1, 1960. Plaintiff's counsel agreed that the work expectancy of longshoremen is to age 65, see Porello v. United States, 2 Cir., 1946, 153 F.2d 605, 608, affirmed in part and rev'd in part sub nom. American Stevedores, Inc. v. Porello, 1947, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011. On this basis Robillard would have had a work expectancy of 8⅓ years from

the date of judgment. Giving weight to the possibilities of improvement and of vocational rehabilitation, I find his loss of earnings will be at the annual rate of $2,500. Discounting this on a 4% basis, Alexander v. Nash-Kelvinator Corp., 2 Cir., 1959, 271 F.2d 524, 527, produces a figure of $17,442 which I shall round off upward to $17,500.

To these two sums of $9,500 and $17,-500 there will be added $905.36 for medical expenses conceded to be reasonable and $3,000 for past and future pain and suffering, for a total of $30,905.36.

This constitutes the court's findings of facts and conclusions of law, Admiralty Rule 46½, 28 U.S.C. Let judgment be entered accordingly.