Espedit OBLATORE, Libellant-Appellant,

v.

UNITED STATES of America, Respondent-Appellee,

American Stevedores, Inc., Respondent-Impleaded-Appellee.

No. 305, Docket 26364.

United States Court of Appeals Second Circuit.

Argued April 14, 1961.

Decided April 28, 1961.

Diego R. Camarda, Brooklyn, N. Y., for libellant-appellant.

Ronald A. Jacks, Atty., Dept. of Justice, Washington, D. C. (William H. Orrick, Jr., Asst. Atty. Gen., Elliott Kahaner, U. S. Atty., Brooklyn, N. Y., and Morton Hollander, Atty., Dept. of Justice, Washington, D. C., on the brief), for respondent-appellee the United States.

Michael J. Kenny, New York City (George J. Conway, New York City, on the brief), for respondent-impleaded-appellee.

Before MEDINA, MOORE and FRIENDLY, Circuit Judges.

MEDINA, Circuit Judge.

On March 20, 1957, libellant, a longshoreman, employed by American Stevedores, Inc., was injured while engaged in loading operations aboard the USNS Henry Gibbins, a public vessel owned and operated by the United States and moored to a pier at the Brooklyn Army Terminal, Brooklyn, New York. The libel against the United States under the Public Vessels Act, 46 U.S.C.A. § 781, alleged both unseaworthiness and negligence in failing to provide libellant with a safe place to work. The United States impleaded American Stevedores, Inc., claiming that if it was liable to libellant, American was liable to it. After a trial to a judge both the libel and the impleading petition were dismissed.

Libellant was injured while he and other members of his gang were engaged in placing a hatch cover in position at the D-deck level of the Number 2 trunk hatch of the Henry Gibbins. The Number 2 trunk hatch was a rectangular shaft measuring 24 by 20 feet and enclosed by bulkheads on all sides. At the D-deck level it had three rectangular access ports on both its port and starboard sides, each access port being located above one of the beam sockets for three 'thwartship beams, which when in place ran the width of the hatch. There were no access ports fore and aft. A four inch metal lip ran along all sides of the hatch at the beam socket level, and a metal pipe grab rail ran along all sides of the hatch about four feet above this lip. The hatch would be covered first by placing the three 'thwartship beams in their sockets and then by covering them with several hatch covers, each of which was smaller than the hatch opening. At the time of the accident the longshoremen were engaged in placing the first hatch cover at the D-deck level. It was composed of a number of wooden boards banded together and covered by steel, measured 10 by 6 feet, and weighed approximately 750 pounds. The hatch cover was suspended on a four-legged wire rope bridle attached to the up and down falls of the starboard boom and was rigged directly over the center of the hatch. It was lowered into the center of the hatch to the D-deck level but was to be placed off center in the forward starboard corner of the hatch. Once the hatch cover had been lowered to the D-deck level libellant and two other

longshoremen stepped or climbed on the hatch cover and began to move it, still attached to the starboard boom, to the forward starboard corner of the hatch. They attempted to do this in part by pushing the hatch cover into position with their feet. In other words, they were riding or standing upon the hatch cover, and each time they moved it the stress increased, because it was still attached to the boom which was rigged directly in the center of the hatch. Libellant attempted to bring the cover into position by pulling on the grab rail and forcing the cover with his feet. While he was doing this, the cover, which was suspended about three inches above the 'thwartship beams, twisted out from under libellant's feet, and he fell to the deck below.

The trial judge made findings of fact and conclusions of law. He found, *inter alia*, that the accident was caused by the fact that the hatch cover twisted out from under libellant's feet; that the Henry Gibbins was inspected and approved by the American Bureau of Shipping for its highest classification twice, in 1956 and again in 1957; that the Coast Guard had inspected the Henry Gibbins in 1956 and 1957 and had found her holds and hatches seaworthy. He also found that the United States did not supervise the longshore operations and had no part in selecting the method of replacing the hatch cover which the longshoremen used; that the longshoremen could have used alternative methods to replace the hatch cover and that the method actually chosen—riding the hatch cover—involved some risk; and, finally, that the operation was conducted exclusively by the longshoremen.

From these findings the trial judge concluded that on the date of libellant's accident the Henry Gibbins "was in all respects seaworthy as to the D-deck level of the No. 2 trunk hatch"; that the United States did not breach its warranty of seaworthiness; that it did not owe to libellant any duty to select or supervise the method of replacing the hatch cover used by the longshoremen; and that the

United States was in no respect negligent.

■ On this appeal libellant attacks various findings of fact by the trial judge as clearly erroneous. While libellant advances reasons for rejecting these findings which a court of first instance might find cogent, they are not appropriately addressed to us, because we can by no stretch of the imagination say that any of the findings were clearly erroneous. Nor can we say the Henry Gibbins was as a matter of law unseaworthy. Moreover, since the trial judge found that the United States did not supervise or control the longshoremen, but rather that the work was conducted solely by the longshoremen themselves, we cannot say that in the circumstances of this case the United States violated its duty to provide the longshoremen with a safe place to work. See Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397, 400.

Libellant's objections to various evidentiary rulings made by the trial judge are likewise without merit. We shall discuss only one of these.

■ There was some evidence that the hatch cover from which libellant fell was wet and slippery, a condition caused by the fact that the longshoremen had left it out in the rain all day. While the libellant himself did not remember slipping when he fell, he apparently introduced this proof on the theory that this condition made the hatch cover harder to handle and thus, as an unseaworthy condition, contributed to the accident. On one occasion libellant's witness Vecchio, who along with libellant was riding the hatch cover, testified that his feet were slipping, because the hatch cover was wet. This testimony was stricken. However, on other occasions both libellant and Falanga, the third man on the hatch cover, testified that the hatch cover was wet and slippery. Since the trial judge did not strike this testimony, we can only assume that he considered it, but decided, as indicated by the findings, that the accident was due, not to the wet and

slippery condition of the hatch cover, but to the fact that tension on the falls caused the hatch cover to twist out from under libellant, and this tension or pull toward the center of the hatch was increased in force as the longshoremen attempted to push the hatch cover into its position away from the center of the hatch.

Affirmed.