Carmelo **VENTRE**, Plaintiff,

v.

**R. A. OETKER**, Hamburg, Germany, Defendant and Third-Party Plaintiff,

v.

**INTERNATIONAL TERMINAL OPERATING CO., Inc.**, Third-Party Defendant.

Civ. No. 19140.

United States District Court
E. D. New York.

Feb. 21, 1963.

ant (hereinafter referred to as "International"). On June 9, 1958, he was working aboard the M/V Cap Frio, owned and operated by the defendant (hereinafter referred to as "Oetker"), when he was injured. He sues Oetker for negligence and for failure to provide a seaworthy ship. Oetker is suing International for indemnity, claiming that International contracted with it to perform stevedoring work for Oetker aboard said ship "in a safe, careful, competent and workmanlike manner" (paragraph SEVENTH of third-party complaint); that it failed to do so and that plaintiff's injuries were caused solely by International's failure to so perform its work.

Plaintiff claims to have sustained his injuries while he and members of his gang were removing the reefer plugs from the port No. 3 refrigerator hatch, commonly referred to as a "reefer hatch".

Plaintiff and other employees of International boarded the vessel at Pier 2, Erie Basin, Brooklyn, New York, at 7 A. M., for the purpose of unloading the vessel. Plaintiff and his gang were assigned by International to unload the aft section of said reefer hatch. They did not commence their work until 8 A.M. At the trial, plaintiff stipulated that the vessel was seaworthy at 7 A.M., when International's men boarded the vessel. There is no evidence that this condition did not continue from 7 A.M. to 8 A.M. when International's men began to remove the reefer plugs. Plaintiff contends that he was unaware of the proper order in which the reefer plugs should be removed; that Oetker failed to advise him as to the proper order in which these plugs should be removed; that he was compelled by Oetker to use the same plugs he was removing from the hatch as a flooring for ingress to and egress

Santo R. Sgarlato, Jr., Brooklyn, N. Y., for plaintiff, William F. Cioffi, Brooklyn, N. Y., of counsel.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for defendant and third-party plaintiff, Robert S. Blanc, Jr., J. P. Catuzzi, Jr., New York City, of counsel.

Alexander, Ash & Schwartz, New York City, for third-party defendant, Joseph Arthur Cohen, New York City, of counsel.

ZAVATT, Chief Judge.

The plaintiff [1] (hereinafter referred to as "Ventre") is a longshoreman who was in the employ of the third-party defend-

1. This action was instituted on the Civil side of the court. When this case was pretried it appeared that, at the time the action was commenced, the plaintiff and the defendant were aliens. The action was transferred to the Admiralty side of the court and was tried as an admiralty cause. None of the pleadings were amended, with the result that Ventre is described as plaintiff; the owner of the vessel is described as the defendant and the third-party plaintiff and the stevedoring company is described as the third-party defendant.

from the hatch; that this flooring became dangerous and unsuited to its purpose the moment the improper sequence of removal was employed by him and his fellow worker; that this dangerous condition persisted until the accident occurred; that three mates on duty at the time of and prior to the accident failed by supervision, warning or other means to give notice and warning of the danger ahead.

Oetker is the owner of 25 to 30 vessels, at least 8 of which are refrigerator ships. One, the Cap Blanco, is a sister ship of the M/V Cap Frio. The arrangement of the reefer plugs on the refrigerator hatches of these two vessels is identical. International loads or unloads an average of one refrigerator ship a week—including ships owned by Oetker, the Columbus Line and others. The reefer plugs on the refrigerator hatches of vessels of the Columbus Line are similar to those on the M/V Cap Frio. International had worked on the M/V Cap Frio and on her sister ship on several occasions prior to June 9, 1958; had opened up the port No. 3 reefer hatch of the M/V Cap Frio and identical reefer hatches of her sister ship prior to June 9, 1958. Split plugs (reference will be made hereafter to plugs A and B) are common to refrigerator hatches. Experienced longshoremen employed by International know that reefer plugs are beveled and such longshoremen have had experience with reefer plugs similar to those on the M/V Cap Frio prior to June 9, 1958. Although plaintiff had been working for International for approximately fifteen months before June 9, 1958 and had worked in reefer hatches, he had never before worked on the removal of reefer plugs. June 9, 1958, marked the occasion of his first experience in removing such plugs.

When the reefer plugs of the aft section of the hatch in question are in place, they are as shown on the following diagram:

It will be noted that plugs A, B, D and F are wider and that plugs C and E are narrower at the top; that plug B is longer than plug A; that plug B bevels outward and plug A bevels inward where these two plugs meet. The forward ends of plugs B, C, D, E and F rest on a hatch beam; the aft end of plugs A, C, D, E and F rest on the aft coaming edge. The starboard sides of plugs A and B rest

on a tapered support along the lip of the coaming; the port side of plug F rests on a tapered support along the lip of the coaming; there is no support for the forward end of plug A and the aft end of plug B other than their beveled juncture; the forward end of plug A rests on the aft beveled end of plug B; there is no beam under the point where plugs A and B meet.

Plugs A and B each weigh approximately 200 pounds. Plugs C, D, E and F each weigh from 400 to 500 pounds. Because of their weight they must be lifted by a winch. Therefore, there are rings on the top of each of such plugs to which hook eyes are attached when a plug is to be lifted. There are two such rings at either end of all of the plugs except plug A. There is only one ring at each end of plug A. When the steel hatch covers have been removed and the plugs are still in place the distance from the deck to the top of the coaming is three feet and the distance from the top of the coaming to the top of the plugs is three feet. Since plugs C and E are wider at the bottom than the plugs adjoining them, they cannot be removed first. There are several possible orders in which such reefer plugs may be removed including (1) starting with plug F and then removing plugs E, D, C, B and A; (2) starting with plugs A and B and then removing plugs C, D, E and F or (3) starting with plug D and removing other plugs according to one of several alternatives.

On the date in question Ventre and a co-worker, Leroy Emery, were assigned to hook up the bridle to the rings on the plugs of the aft section of the port No. 3 reefer hatch. The entire reefer hatch has three sections, each of which has a set of plugs similar to those shown on the diagram. Over the reefer plugs of each section there are steel hatch covers. The hatch covers of all three sections had been removed. Plug D was the first plug removed. As the bridle was lowered, Emery stood on the plugs of the middle of the three sections. It is not clear whether he stepped onto plug D as he hooked the bridle up to the forward rings of plug D or whether he did so while standing on the plugs of the middle section of the hatch. In either event, as plug D was lifted he stood on the plugs of the middle section of the hatch. Ventre stood on plug D while he hooked up the bridle to the two aft rings of plug D. After having done so, he stepped from plug D to plug E where he stood as plug D was lifted and removed. Ventre and Emery followed the same procedure with reference to plug E. After this plug had been hooked up Emery stood on the plugs of the middle section and Ventre stood on plug F as plug E was lifted and removed. After they had hooked up the bridle to plug F, Emery stood on the plugs of the middle section and Ventre stepped over the coaming onto the deck where he stood as plug F was lifted and removed. Ventre then walked around the coaming, stepped from the deck over the coaming onto plug C. Emery walked along the plugs of the middle section to a point at the forward end of plug C. He hooked up the bridle to the forward rings of plug C and then stood on the plugs of the middle section. Ventre stood on plug C while he hooked up the bridle to the two aft rings of that plug and then stepped onto plug A. International's pier superintendent was coming up on the deck at that time. He saw plug C being hooked up and saw Ventre step onto plug A. Plug C had not yet been lifted. The pier superintendent "hollered to stop" but the lifting of plug C was not stopped. Plug C was lifted. As it was being lifted the main support was pulled out from underneath Ventre; plugs A and B collapsed and they and Ventre fell about ten feet into the hold.

The stevedoring personnel, who were working in the immediate vicinity of the hatch while the plugs were being removed, included Magliuolo (the relief man on the winch) who was curling up the guide rope; a hatch boss, Doca, who was tightening up the booms while Ventre and Emery were hooking up the bridle to the plugs and the operator of

the winch. It is not clear whether, in addition, there was a signalman or whether Ventre or Emery gave the lift signals to the winchman. In any event, the plugs, Ventre and Emery were in plain sight of the winchman.

Ventre claims that he was forced to stand on an adjacent plug after he had hooked up the bridle to a plug about to be lifted. The court finds that he was not forced, compelled or required to do so; that he could and should have stood on the deck after he had hooked up the bridle to plug C. It is to be noted that, after Ventre hooked up the bridle to plug F, he stepped onto the deck before that plug was lifted. Had he done the same thing after he hooked up plug C this accident would not have happened. International's pier superintendent knew that Ventre should not be standing on plug A while plug C was being lifted. He was aware of the danger the moment he saw Ventre standing there and, for that reason, he yelled.

 No ship's personnel were assigned to supervise nor did they in fact supervise International's removal of the reefer plugs. No member of the ship's crew was in the vicinity of the port No. 3 hatch while International's employees were removing the reefer plugs.[2] Oetker was under no duty to supervise the details of the work of International in removing the reefer plugs from this hatch. A shipowner which hires a stevedoring company, such as International, is not liable for harm resulting from negligence on the part of the stevedore in conducting the details of its work. Knox v. United States Lines, Co., 294 F.2d 354 (3d Cir., 1961); Oblatore v. United States, 289 F.2d 400 (2d Cir., 1961), cert. denied 368 U.S. 881, 82 S.Ct. 132, 7 L.Ed.2d 81; Berti v. Compagnie De Navigation Cyprien Fabre, 213 F.2d 397 (2d Cir., 1954); Gallagher v. United States Lines, Co., 206 F.2d 177, 179 (2d Cir., 1953), cert. denied 346 U.S. 897, 74 S.Ct. 221, 98 L.Ed. 398. If, on the other hand, an obviously hazardous condition is created by the longshoremen and permitted to exist long enough for normal occasional observation of the course and progress of the work to disclose the existence of the danger to some officer of the ship, then the ship may be found to have been negligent in suffering the dangerous condition to continue. Knox v. United States Lines, Co., supra. Oetker had no reason to suspect that any of International's employees aboard were not familiar with their calling; that Ventre had never before removed reefer plugs; that International's supervisory personnel would not inform Ventre of the proper, safe method of removing these plugs; that Ventre's fellow workers would not do the same; that Ventre would stand on plug A while plug C was being lifted. Oetker was under no duty to instruct Ventre as to any order in which the plugs should be removed and cannot be held to have been negligent in having failed to do so. The unsafe condition complained of arose only when Ventre remained standing on plug A as plug C was lifed. As long as plug C was in place, it was not unsafe for Ventre to stand on plug A. No member of the crew saw him standing on plug A or knew or had reason to believe that he would stand there as plug C was raised. Robillard v. A. L. Burbank & Co., Ltd., 186 F.Supp. 193 (S.D.N.Y.1960). The unsafe condition existed for a matter of seconds, far too short a period of time before the accident to impose liability in negligence on Oetker.

██ The momentary unsafe condition was due to the negligence of International. The unseaworthiness of the ship

2. Ship's officers and crew members were aboard the vessel. Some of them were on the same deck. None of them were in the vicinity of this hatch. Even were ship's officers or crew members in the vicinity of this hatch during the removal of the plugs, their mere presence would not place upon Oetker the duty to supervise the details of that operation. Puddu v. Royal Netherlands Steamship Company, 303 F. 2d 752 (2d Cir., 1962); Berti v. Compagnie De Navigation Cyprien Fabre, supra; Robillard v. A. L. Burbank & Co., 186 F. Supp. 193 (S.D.N.Y.1960).

**664**

existed for the brief instant during which plug C was raised while Ventre was standing on plug A. The doctrine of unseaworthiness has not been extended to allow recovery for injuries caused by the contemporaneous negligent use of seaworthy equipment. Massa v. C. A. Venezuelan Navigacion, 209 F.Supp. 404 (E.D.N.Y.1962) and cases cited therein.

In view of the foregoing the complaint and the third-party complaint are to be dismissed.

This opinion constitutes the court's findings of fact and conclusions of law. The parties may, on or before ten (10) days from the date hereof, submit additional proposed findings of fact and conclusions of law consistent herewith.

Settle an order, consistent herewith, on or before fifteen (15) days from the date hereof.