GUTIERREZ *v.* WATERMAN STEAMSHIP CORP.

No. 229.   Argued ·March 21, 1963.—Decided May 13, 1963.

*Harvey B. Nachman* argued the cause for petitioner. With him on the brief was *Stanley L. Feldstein.*

*Antonio M. Bird* argued the cause and filed a brief for respondent.

*T. E. Byrne, Jr.* and *Mark D. Alspach* filed a brief for Ellerman & Bucknall Steamship Co., Ltd., et al., as *amici curiae,* urging affirmance.

MR. JUSTICE WHITE delivered the opinion of the Court.

Petitioner, a longshoreman unloading the S. S. *Hastings* at Ponce, Puerto Rico, slipped on some loose beans spilled on the dock and suffered personal injuries. He subsequently filed a libel against the *Hastings,* claiming damages for injuries caused by the ship's unseaworthiness and by the negligence of its owner, the respondent corporation. The case was tried in admiralty before the United States District Court for the District of Puerto Rico, and the court found the following facts relevant in the present posture of the case. 193 F. Supp. 894.

The cargo of beans was packed in broken and defective bags, some of which were being repaired by coopers aboard the ship during unloading. Beans spilled out of the bags during unloading, including some from one bag which broke open during unloading; and the scattering of beans about the surface of the pier created a dangerous condition for the longshoremen who had to work there. The shipowner knew or should have known that injury was likely to result to persons who would have to work around the beans spilled from the defective bags, and it was negligent in allowing cargo so poorly stowed or laden to be unloaded. Petitioner fell on the beans and injured himself, and such injuries were proximately caused by the respondent's negligence and the unseaworthiness of its cargo or cargo containers.

208

Although petitioner filed his libel over a year after the analogous Puerto Rican statute of limitations ran,[1] the court found that the delay was excusable and that no prejudice to respondent was occasioned by the delay, since it had access at all times to its and the stevedore's[2] records which contained the relevant facts and since all the potential witnesses were available and produced at trial. Accordingly, the trial court entered a money judgment of some $18,000 for petitioner.

Respondent appealed to the United States Court of Appeals for the First Circuit, which reversed with directions to dismiss the action. 301 F. 2d 415. It held that respondent had not been negligent, as a matter of law, because it "had neither control of nor even a right to control" the pier. The court also stated that petitioner did not prove what particular beans he slipped on, and that the ones responsible for his fall might have come from a bag that "for all that appears" may have been dropped and broken open due to some third party's negligence. As for seaworthiness, the court held that the shipowner was not responsible for the lading, or cargo containers, stating: "The very fact that unseaworthiness obligations are 'awesome' . . . suggests that they should not be handled with prodigality. We are unwilling to recognize one here." Finally, it reversed the conclusion below as to laches, since the availability to respondent of the witnesses when the libel was filed was not as advantageous to it as would have been an opportunity to examine them at an earlier date. That this was preju-

---

[1] Petitioner's injury was covered by the Puerto Rico Workmen's Compensation Act, under which suits must be instituted within a year following the date of the final decision in the case by the Manager of the State Insurance Fund. Puerto Rico Laws Ann. § 11:32.

[2] The stevedore was Waterman Dock Company, a wholly owned subsidiary of respondent Waterman Steamship Company.

dicial, the court concluded, was shown by the fact that the witnesses' testimony was at variance with respondent's records of the ship's unloading. Petitioner sought certiorari from this adverse judgment and we brought the case here, 371 U. S. 810, to resolve the apparently troublesome question as to the shipowner's liability for his torts which have impacts on shore. We have concluded that the judgment of the Court of Appeals must be reversed with respect to each of the three headings involved.

## I.

At the outset we are met with an issue which is said to be jurisdictional. Counsel for respondent candidly admits failure to raise the point below, but as is our practice we will consider this threshold question before reaching the merits. *McGrath* v. *Kristensen*, 340 U. S. 162, 167–168; *Ford Motor Co.* v. *Treasury Dept.*, 323 U. S. 459, 467; *Matson Nav. Co.* v. *United States*, 284 U. S. 352, 359 (admiralty case); *Grace* v. *American Ins. Co.*, 109 U. S. 278, 283; *Hope Ins. Co.* v. *Boardman*, 5 Cranch 57; see *Wheeldin* v. *Wheeler*, 371 U. S. 812; *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 305–306.

Respondent contends that it is not liable, at least in admiralty, because the impact of its alleged lack of care or unseaworthiness was felt on the pier rather than aboard ship. Whatever validity this proposition may have had until 1948, the passage of the Extension of Admiralty Jurisdiction Act, 62 Stat. 496, 46 U. S. C. § 740, swept it away when it made vessels on navigable water liable for damage or injury "notwithstanding that such damage or injury be done or consummated on land." Respondent and the carrier *amici curiae* would have the statute limited to injuries actually caused by the physical agency of the vessel or a particular part of it—such as when the ship rams a bridge or when its defective winch drops some

cargo onto a longshoreman. Cf. *Strika* v. *Netherlands Ministry of Traffic*, 185 F. 2d 555 (C. A. 2d Cir.); *Hagans* v. *Farrell Lines*, 237 F. 2d 477 (C. A. 3d Cir.). Nothing in the legislative history supports so restrictive an interpretation of the statutory language. There is no distinction in admiralty between torts committed by the ship itself and by the ship's personnel while operating it, any more than there is between torts "committed" by a corporation and by its employees. And ships are libeled as readily for an unduly bellicose mate's assault on a crewman, see *Boudoin* v. *Lykes Bros. Co.*, 348 U. S. 336, 339–340; *The Rolph*, 299 F. 52 (C. A. 9th Cir.), or for having an incompetent crew or master, see *Keen* v. *Overseas Tankship Corp.*, 194 F. 2d 515, 517 (C. A. 2d Cir.), as for a collision. Various far-fetched hypotheticals are raised, such as a suit in admiralty for an ordinary automobile accident involving a ship's officer on ship business in port, or for someone's slipping on beans that continue to leak from these bags in a warehouse in Denver. We think it sufficient for the needs of this occasion to hold that the case is within the maritime jurisdiction under 46 U. S. C. § 740 when, as here, it is alleged that the shipowner commits a tort[3] while or before the ship is being unloaded, and the impact of which is felt ashore at a time and place not remote from the wrongful act.

## II.

As indicated, *supra*, the trial court found respondent negligent in allowing the beans to be unloaded in their defective bagging, when it knew or should have known that injury was likely to result to persons having to work about the beans that might, and did, spill. There was substantial evidence to support these findings. Wit-

---

[3] The question of whether the warranty of seaworthiness extends to longshoremen on the dock is considered, *infra*, at pp. 213–214.

nesses testified that beans spilled out of broken bags throughout unloading, and this is corroborated by respondent's records of the unloading, which stated that bags of beans were found torn at the time of discharging and some of them were recoopered. Moreover, the trial court was entitled to infer that respondent should have known of the defective condition of the bagging when the bean bags were leaking while still in the ship, when beans spilled out of the bags throughout unloading, and when coopers were sent aboard to repair the torn bagging. To be sure, there is some conflict between details of the testimony and respondent's records of the unloading, but the trial court was entitled to believe the one rather than the other. As for the possibility that the beans petitioner slipped on may have come from some other source, such as "for all that appears" a third party, it is sufficient to note that the trial court was not plainly erroneous in not so believing.

The force of these fact findings is not lessened by the contention that respondent did not control the pier or have "even a right to control that locus," 301 F. 2d, at 416. We doubt that respondent had no license to go upon the pier at which it was docked and clean up the loose beans, if it had wanted to; the beans were its cargo that it was unloading onto the pier. But we may put this aside, since control of the impact zone is not essential for negligence. The man who drops a barrel out of his loft need not control the sidewalk to be liable to the pedestrian whom the barrel hits. See *Byrne* v. *Boadle,* 2 H. & C. 722 (Exch.). And the same holds for the man who spills beans out his window, on which the pedestrian slips. Respondent allowed the cargo to be discharged in dangerous and defective bagging, from which beans were leaking before discharge of the cargo began. It had an absolute and nondelegable duty of care toward petitioner

not to create this risk to him, which it failed to meet. When this lack of care culminated in petitioner's injury, respondent became legally liable to compensate him for the harm.

### III.

The trial court also found unseaworthiness in the condition of the bagging. Two questions are raised in this connection: (1) whether the use of defective cargo containers constitutes unseaworthiness, and (2) whether the shipowner's warranty of seaworthiness extends to longshoremen on the pier who are unloading the ship's cargo.

The first question is not one of first impression, for it was decided in petitioner's favor in *Atlantic & Gulf Stevedores, Inc.*, v. *Ellerman Lines, Ltd.*, 369 U. S. 355. There a longshoreman was injured when a bale of burlap cloth fell on him because the metal bands wrapped about the bales, cf. *Cotton-Tie Co.* v. *Simmons*, 106 U. S. 89, broke while the bales were being hoisted with a hook and winch. The trial court charged the jury that "if you find that the bands of the bale were defective, were inadequate, or insufficient . . . then you might find the defendants liable under the doctrine of unseaworthiness." *Id.*, at 361, n. 3. The charge became critical in the posture of the case before this Court because the Court of Appeals had reversed the portion of the judgment in favor of the stevedore on the shipowner's claim for indemnity because both had been negligent, in the Court of Appeals' view of the jury's special findings. This Court reinstated the original judgment because "there is a view of the case that makes the jury's answers to special interrogatories consistent," namely, on the matter covered by the *proper* charge on unseaworthiness, and therefore the interrogatories "must be resolved that way . . . [to avoid] a collision with the Seventh Amendment." *Id.*, at 364. That unseaworthiness could be predicated upon the defectiveness of the

metal bands wrapped around and used to contain the burlap cargo was thus essential to the disposition of the case.

The holding in *Ellerman* is consistent with earlier decisions.[4]   Seaworthiness is not limited, of course, to fitness for travel on the high seas; it includes fitness for loading and unloading.   *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85.   It has already been held that when cargo is stowed unsafely in the hold a longshoreman injured thereby may recover for unseaworthiness.   *E. g., Rich* v. *Ellerman & Bucknall Co.*, 278 F. 2d 704, 706 (C. A. 2d Cir.); *Curtis* v. *A. Garcia y Cia.*, 241 F. 2d 30, 33–34 (C. A. 3d Cir.); *Palazzolo* v. *Pan-Atlantic Corp.*, 211 F. 2d 277, 279 (C. A. 2d Cir.), aff'd on other grounds, 350 U. S. 124, 134; see *Morales* v. *City of Galveston*, 370 U. S. 165, 170 (dictum).[5] And in at least one case it has been held that a longshoreman could recover for injuries caused by a "latent defect" in a cargo crate which broke when the longshoreman stood on it.   *Reddick* v. *McAllister Line*, 258 F. 2d 297, 299 (C. A. 2d Cir.).

These cases all reveal a proper application of the seaworthiness doctrine, which is in essence that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used.   See *Mitchell* v. *Trawler Racer, Inc.*, 362 U. S. 539, 550; *Morales* v. *City of Galveston*, 370 U. S. 165, 169, 172 (dissenting opinion).   A ship that leaks is unseaworthy; so is a cargo container that leaks.   When the shipowner

---

[4] The *Ellerman* case was cited with approval in the later decision, *Morales* v. *City of Galveston*, 370 U. S. 165, 170, and the majority of the Court in *Morales*, with one exception, joins the majority here *Morales*, of course, did not involve the unseaworthiness of cargo containers, but rather that of a ship's hold.

[5] But see *Carabellese* v. *Naviera Aznar, S. A.*, 285 F. 2d 355 (C. A. 2d Cir.) (top-heavy crate of machinery).

accepts cargo in a faulty container or allows the container to become faulty, he assumes the responsibility for injury that this may cause to seamen or their substitutes on or about the ship. Beans belong inside their containers, and anyone should know, as the trial court found, that serious injury may result if they get out of their containers and get underfoot. These bean bags were unfit and thus unseaworthy.

The second question is one of first impression in this Court, although other federal courts have already recognized that the case law compels this conclusion. *Strika* v. *Netherlands Ministry of Traffic,* 185 F. 2d 555 (C. A. 2d Cir.); *Robillard* v. *A. L. Burbank & Co.,* 186 F. Supp. 193 (S. D. N. Y.); see *Pope & Talbot, Inc.,* v. *Cordray,* 258 F. 2d 214, 218 (C. A. 9th Cir.). In *Strika,* while the longshoreman was working on the dock, use of an improper wire cable caused a hatch cover to fall on him. Building on such cases as *O'Donnell* v. *Great Lakes Co.,* 318 U. S. 36, where seamen recovered under the Jones Act for injuries due to the owner's negligence despite their being ashore at the time, and *Sieracki, supra,* where longshoremen aboard ship doing seamen's tasks were permitted to recover for unseaworthiness, the court held that the tort of unseaworthiness arises out of a maritime status or relation and is therefore "cognizable by the maritime [substantive] law whether it arises on sea or on land." Accordingly, the court permitted recovery for unseaworthiness. See also *Hagans* v. *Farrell Lines,* 237 F. 2d 477 (C. A. 3d Cir.), where the point was assumed in a case involving a longshoreman on the pier struck with sacks of beans when a defective winch did not brake properly.

In *Robillard, supra,* a longshoreman was injured when, because of unseaworthy stowage and overladen drafts, he was struck by some cargo that was knocked off the deck onto the pier. The court found "the logic of these authorities . . . [*Sieracki, Strika,* etc.] ineluctable" and

allowed recovery in unseaworthiness while denying it in negligence.

We agree with this reading of the case law and hold that the duty to provide a seaworthy ship and gear, including cargo containers, applies to longshoremen unloading the ship whether they are standing aboard ship or on the pier.

IV.

Finally, we have concluded that the ruling of the trial court on laches is not plainly erroneous and should not have been reversed. The test of laches is prejudice to the other party. *Gardner* v. *Panama R. Co.*, 342 U. S. 29, 30–31; *Cities Service Co.* v. *Puerto Rico Co.*, 305 F. 2d 170, 171 (C. A. 1st Cir.) (both unreasonable delay and consequent prejudice). The trial court, having heard the witnesses testify, concluded that there was no prejudice. The Court of Appeals had no warrant to reverse this finding as plainly erroneous merely because in some way it might have been more advantageous to respondent to question the witnesses sooner than it did.[6] Nor can

---

[6] We note that respondent admits in its brief that "petitioner's witnesses were available . . . , that the payroll records of the stevedore indicated the potential eyewitnesses, that the accident report filed by the stevedore named the witnesses and formed part of the record of the State Insurance Fund, that respondent produced evidence indicating the cargo damaged prior to and at the time of the discharge, that medical records indicating treatment and the names of the treating physicians were available, and that the respondent took petitioner's deposition and submitted interrogatories . . . ." Moreover, the record indicates that respondent never bothered to interview the petitioner's witnesses Roman or Cintron before trial, despite the fact that petitioner's answers to interrogatories named them. And respondent does not contradict petitioner's contention that respondent chose not to interview any of the witnesses even though it had their names through discovery. In such circumstances it is hardly appropriate for respondent to claim prejudice for want of an opportunity to interview the witnesses sooner. In this connection it should be noted that the accident occurred October 21, 1956;

prejudice be inferred from a variance between the witnesses' testimony and respondent's written records of the unloading. The trial court which heard the witnesses was the proper judge of which evidence was credible; that records differ from testimony here does not mean that respondent was prejudiced by delay—it means that respondent was "prejudiced" by the fact finder's refusal to believe its evidence and no more.

The Court of Appeals erred in setting the judgment of the District Court aside. The judgment of the Court of Appeals is reversed and the case remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE HARLAN, dissenting.

The decision in this case has importance in admiralty law beyond what might appear on the surface. It marks another substantial stride toward the development by this Court of a doctrine that a shipowner is an insurer for those who perform any work on or around a ship subject to maritime jurisdiction. While my primary disagreement with the Court goes to its holding on unseaworthiness, I am also unable to agree with its views on the negligence issue.

## I.

The shipowner's duty with respect to seaworthiness is a duty to furnish a vessel that is reasonably fit for its intended use—one that is staunch and strong, that is fitted out with all proper equipment and in good order, and that carries a sufficient and competent crew and com-

the analogous statute of limitations ran out November 30, 1957; the libel was filed January 9, 1959; trial began March 21, 1960—so that as much time elapsed between filing the action and trial, when respondent failed to interview the witnesses, as elapsed during the period of alleged laches.

plement of officers. Gilmore and Black, The Law of Admiralty, 158. As developed by this Court in cases involving injury to seamen and dock workers, the duty has become absolute and has been found to reach even transitory conditions arising after the outset of the voyage. See *Mitchell* v. *Trawler Racer, Inc.*, 362 U. S. 539. But, except for the few unpersuasive instances noted in this opinion, the obligation has remained one relating essentially to the ship and its appurtenances. See *id.*, at 550. Although the doctrine has been extended—in my view, quite questionably—to *equipment* brought on board by a stevedore, see *Alaska S. S. Co.* v. *Petterson*, 347 U. S. 396,[1] the shipowner has not been deemed an insurer of the condition of the *cargo*. His duty with respect to cargo has been to see that it is stowed in a manner that does not make the ship itself an unsafe place to work. See, *e. g.*, *Palazzolo* v. *Pan-Atlantic S. S. Corp.*, 211 F. 2d 277; *Curtis* v. *A. Garcia y Cia.*, 241 F. 2d 30; *Rich* v. *Ellerman & Bucknall S. S. Co.*, 278 F. 2d 704; *Carabellese* v. *Naviera Aznar, S. A.*, 285 F. 2d 355.[2]

The Court, however, has concluded that it is bound by the determination last Term, in *Atlantic & Gulf Stevedores, Inc.*, v. *Ellerman Lines, Ltd.*, 369 U. S. 355, to hold that defective cargo may in and of itself render the shipowner liable for unseaworthiness. I must admit that some language in that case (369 U. S., at 364) does appear to stand for this proposition. But I think it fair to suggest that it was negligence, not unseaworthiness, on which

---

[1] A 6–3 unexplicated *per curiam*.

[2] The result in *Reddick* v. *McAllister Lighterage Line*, 258 F. 2d 297, the only other Court of Appeals case cited by the majority, is consistent with these decisions, for all three judges in *Reddick* agreed that the finding of unseaworthiness could be sustained on the basis of improper stowage. Two of the judges said, but only alternatively, that the finding could "*also* be predicated on the latent defect in the cargo-crate." 258 F. 2d, at 299. (Emphasis added.)

attention was focused there—indeed unseaworthiness was neither briefed nor argued. At all events I am frank to say that in concurring in the result in that case, unseaworthiness as a distinct issue entirely eluded me, as it evidently did the dissenters, who interpreted the majority opinion as suggesting that the jury's finding was premised on a *negligent* failure to inspect the cargo containers. See 369 U. S., at 365. Moreover, the case cited by the *Ellerman* Court in support of its unseaworthiness conclusion, *Weyerhaeuser S. S. Co.* v. *Nacirema Co.*, 355 U. S. 563, did not even touch upon such an issue. So casual a determina • on should not be blindly accepted as fastening on the law of admiralty such a far-reaching innovation. At least it should not preclude us from considering the question anew when it is now fully and squarely presented.[3]

The Court's decision after *Ellerman*, in *Morales* v. *City of Galveston*, 370 U. S. 165, is the strongest evidence that *Ellerman* was not regarded as establishing the fundamental change in the law of unseaworthiness for which it is now cited. In *Morales*, a longshoreman working in the hold of a ship had been injured by the fumes emanating from grain that had been improperly treated with an excessive amount of a chemical insecticide. The grain in question had been found to be "contaminated," although not due to the fault or with the knowledge of the city or the shipowner, and the question before this Court was whether the longshoreman could recover for unseaworthiness. The Court sustained the conclusion of the lower courts that he could not, because under the circumstances

---

[3] I do not attach significance to the fact that in *Ellerman* the Court was asked in a petition for rehearing to reconsider whether cargo can itself be unseaworthy. Petitions for rehearing lie within the broad discretion of the Court and are almost never granted. Indeed, this petition for rehearing serves principally to underscore the fact that the point had not been briefed, argued, or apparently even considered by the parties as germane to the case prior to its decision.

the absence of a forced ventilation system in the hold did not constitute unseaworthiness.

"What caused injury in the present case, however, was not the ship, its appurtenances, or its crew, but the isolated and completely unforeseeable introduction of a noxious agent from without. The trier of the facts ruled, under proper criteria, that the *Grelmarion* [the ship] was not in any manner unfit for the service to which she was to be put, and we cannot say that his determination was wrong." 370 U. S., at 171.

The crucial point for present purposes is that both the majority and the dissenting opinions in *Morales* viewed the issue in terms of the seaworthiness of the *ship:* whether or not it should have had a forced ventilation system in the hold. Nowhere was it even suggested that liability for unseaworthiness could arise solely by virtue of the defective state of the *cargo* itself, even though its contaminated and unsafe condition had clearly been established and was not in dispute. Thus the Court in *Morales* unanimously ignored the possibility of a doctrine which the Court today concludes was squarely established less than three months earlier, in *Ellerman.*[4]

## II.

In order to conclude that the respondent shipowner was negligent in the circumstances presented here, it was necessary for the trier of fact to find that the respondent knew or should have known of the defective condition of the bags being unloaded. It is doubtful that such a

---

[4] The Court in *Morales* cited *Ellerman,* along with several other cases, *only* for the proposition that a ship might be unseaworthy because "[t]he method of loading her cargo, or the manner of its stowage, might be improper." 370 U. S., at 170. Such a proposition, of course, is wholly different from the one for which *Ellerman* is cited today.

finding was made by the trial judge in this case—the closest he came was the statement that the shipowner was negligent in permitting broken and weakened bags to be discharged "when it knew or should have known that injury was likely to result." This finding passes over the basic question: whether respondent had notice, or constructive notice, of the condition of the bags themselves.

Even assuming for present purposes that the necessary finding as to notice was made, I believe that the judgment on negligence cannot be sustained, for there is no evidence whatever to support such a finding. The evidence in the record, including the landing report, relates only to the *stevedore company's* knowledge of the condition of the bags. There is nothing to suggest that any agent or employee of the respondent was or should have been in the area, or knew or should have known of the condition of the cargo at the time of unloading.[5] And of course there is no basis in law for charging the shipowner with responsibility for any negligence on the part of the stevedore company.

Whether from the standpoint of negligence or unseaworthiness I see no basis for the holding in this case. Presumably the result reached by the Court would be the same—at least consistency demands that it should be the same—if this accident had occurred on the dock while the beans were being *loaded* rather than unloaded. Yet in neither case is there warrant for holding the shipowner to have breached any obligation, for in neither case does it own or control the place where the accident occurred and in neither case is the ship's equipment, property, or crew in any way responsible, with or without fault, for the injury.

Accordingly, I would affirm.

---

[5] The coopers sent aboard were employed by the stevedore company, not the steamship company.