Robert SPANN

v.

**J. LAURITZEN.**

Civ. A. No. 33701.

United States District Court
E. D. Pennsylvania.

Jan. 31, 1964.

John Dorfman, Dorfman, Pechner, Sacks & Dorfman, Philadelphia, Pa., for plaintiff.

John T. Biezup, Rawle & Henderson, Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a civil action by a longshoreman, a member of a gang, employees of T. Hogan Corporation, the stevedore, engaged in the unloading of the defendant's vessel, to recover for injuries against the shipowner. The plaintiff's claim is based upon (1) unseaworthiness and (2) negligence. The defendant has moved for summary judgment.

I find that the following facts are uncontroverted:

At the time of the plaintiff's injury a bulk cargo of nitrate of soda was being discharged by a shore based crane. The crane would lower its bucket into the hold, pick up a load of nitrate, swing it around and drop the nitrate into a hopper on the pier. The hopper, which was owned by Lavino Shipping Company, was a piece of equipment, roughly funnel shaped, the opening at the top being 14' x 11'. When full, it held eight buckets of nitrate, each bucket holding 1¼ cubic yards. The hopper stood on the pier and was not attached to the vessel in any way. It rested on supports which raised it sufficiently high above the floor of the pier to allow a truck to drive under it. The empty trucks would move under the hopper, and it was the plaintiff's job to open the floor of the hopper and let the nitrate which had been discharged into it run out and into the truck waiting below to be filled. This he did by pulling down a heavy horizontal bar or handle. Five buckets of nitrate make a truckload. When the truck was filled, he would close the floor so that it would receive and hold the next load of nitrate.

The plaintiff was injured by a sudden premature downward movement of the handle, which he contends was improperly secured in the raised position.

The many, and sometimes hard to reconcile, decisions upon the subject bear witness to the difficulty which the courts have met in suits by injured longshoremen in attempting to draw the line at which maritime jurisdiction ends.

Various tests have been suggested, frequently only to be discarded as new circumstances were presented. Thus, it is not conclusive, although it may be evidentiary, that the injury was incurred while the plaintiff was not on the ship but working on the dock alongside. Strika v. Netherlands Ministry of Traffic, 2 Cir., 185 F.2d 555. Nor is it of great importance that the instrumentality causing the injury was not owned by the shipowner (Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798) or that the place where the injury occurred was not under his control. Feinman v. A. H. Bull Steamship Co., 3 Cir., 216 F.2d 393. That the thing which injured the plaintiff be attached to or even in physical contact with the ship, often an important consideration, does not appear to be a sine qua non of maritime jurisdiction. Robillard v. A. L. Burbank & Co., Ltd., D.C., 186 F.Supp. 193.

The most recent pronouncement of the Supreme Court upon the subject is to be found in Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed. 297. In that case the injury was caused by the plaintiff's slipping on beans scattered about the surface of the pier. The beans got there because the bags in which they had been stowed on board the ship were defective and the beans spilled out of the bags during unloading. The Court held that the defective condition of the bags rendered them *and the ship* unseaworthy, thus extending the duty to provide a seaworthy ship and gear to containers in which the cargo is stowed on board.

From the cases bearing on the point there would seem to emerge a rule applicable to this case, which can be stated somewhat as follows: In the case of a longshoreman injured on shore, while the ship is being unloaded, two things are needed for him to recover for the maritime tort of unseaworthiness. First, the plaintiff must be engaged in "traditional crew work" which in most cases would mean helping to discharge the cargo. Second, the instrumentality causing the injury must be something "about a ship, whether the hull, the decks,

the machinery, the tools furnished, the stowage, or the cargo containers," Gutierrez v. Waterman Steamship Corp., supra. Where the cause of the injury is a defect in a piece of equipment used in unloading, it should be, if not attached to the vessel, adopted at least temporarily as part of the ship's gear. Reed v. Steamship Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448.

■■ In the present case, as in most of the cases, the nature of the work being done and the character of the instrumentality being used coincide. Thus, in the present case it is critical whether this plaintiff at the time he was injured was engaged in unloading the ship or in loading a truck, because loading trucks on shore is not a sailor's work, and if that is what he was doing not only would he lose the protection accorded to longshoremen doing the work of seamen by the Sieracki case (Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099) but the nature of his work would have a bearing upon the character of the thing which injured him, namely, the hopper. However, the physical character of the piece of equipment causing the injury may in itself be decisive of the question of its adoption as part of the ship's gear. What the Court, in McKnight v. Paterson and Sons, Ltd., D.C., 181 F.Supp. 434, 439, said about a shore based crane applies fully to the hopper in the present case, "Both its size and sole function rebel against any argument that a ship might 'adopt' or 'integrate' such equipment as part of its gear."

■ On the whole, I think that the operation of discharging the cargo or the portion of it with which the plaintiff was concerned had ended when the nitrate was dumped upon the floor of the hopper. The plaintiff argues that the hopper was, in fact, a cargo container, also an instrumentality selected by the stevedores to expedite the discharge of the cargo. I have come to the conclusion that it was neither. The nitrate was accumulated in the hopper for the purpose of conveniently loading the trucks and its use was for the benefit of whoever was to take the nitrate away from the dock. It could have been put on the floor of the dock and loaded into trucks or cars with shovels, or the dock may well have had a second story where the nitrate could have been placed and then shovelled through a trapdoor into a truck below, and it seems apparent that in neither case would the dock have become something "about a ship." Nor can I regard the hopper as a cargo container any more than the clam bucket which lifted the nitrate or the floor of the dock upon which it might have been placed. If it was a container of anything, it was a container of material which had been cargo but which, having become disassociated from the ship, could no longer be so described.

A case which deals with the precise point of law here involved and which is, therefore, dispositive of this case is Fredericks v. American Export Lines, 2 Cir., 227 F.2d 450. In its opinion, the Court said, page 454, "Finally, while in recent years the warranty of seaworthiness has been held by the Supreme Court to cover a pretty wide territory * * * nevertheless, here the injury was incurred by a longshoreman standing on a pier, as a result of the failure of a defective appliance located on the pier and furnished by a subcontractor. No decision so far has extended the sweeping protection of the seaworthiness doctrine to this situation. No vessel was connected with the accident."

Upon the issue of negligence, having determined that the hopper was not part of the ship's gear or appurtenant appliances, it follows that the shipowner was under no duty to inspect or maintain it and, therefore, cannot be held negligent in respect of injury caused by it.

The defendant's motion for summary judgment is granted and judgment may be entered accordingly.