Louis O. LUNA, Libelant,

v.

KAWASAKI KISEN KAISHA, LTD., a corporation, Respondent.

No. 64-1723 EC.

United States District Court
S. D. California,
Central Division.

Sept. 16, 1965.

Spivey & Brown, Wilmington, Cal., for libelant.

Sikes, Pinney & Matthew, Los Angeles, Cal., for respondent.

JAMESON, District Judge.

This is an action in admiralty brought by libelant longshoreman against respondent shipowner for personal injuries resulting from the alleged unseaworthiness of the respondent's vessel, the NEVADA MARU. While the complaint also asserted a cause of action based on negligence, that claim was abandoned by libelant, and the case was tried, before the court without a jury, solely on the issue of alleged unseaworthiness.

By petition the respondent impleaded libelant's employer, Jones Stevedoring Co., but prior to trial the petition was dismissed by stipulation of the parties.

This court has jurisdiction under 28 U.S.C. § 1333.

Libelant, Louis O. Luna, is a longshoreman by trade. The respondent is a corporation having its principal place of business in Japan. On the day libelant was injured, January 24, 1964, respondent's vessel, the NEVADA MARU, was moored at Berth Long-Beach 20 in the Greater Los Angeles-Long Beach Harbor where she was taking on a cargo of baled cotton. Libelant had reported to work at 8:00 A.M. and had been assigned as longshore holdman at the Number 3 hatch, 'tween deck of the NEVADA MARU. As a member of the hatch crew libelant's job was to load bales of cotton into the inshore wing of the hatch. The bales which libelant and his co-workers were handling were about two feet square and were approximately five feet in length. The bales weighed in the neighborhood of 500 pounds each.

Libelant and the crew with whom he was working had spent the previous day loading cotton into the Number 3 hatch 'tween deck, and it had taken the entire day to place one layer of cotton bales in covering the floor of the hatch. On the second day the crew had been working about two and one-half hours when libelant was injured. By about 10:30 A.M. the hatch had been nearly filled and as the last of the bales were being placed in the wings by a process known as "beaming up" [1] the libelant struck his head against one of the overhead beams which formed a regular part of the top of the hatch.

Libelant was the only eye witness to the accident who testified at the trial.[2] He testified on direct examination that the accident occurred as he and his partner were in the process of rolling one of the final bales into the wing preparatory to standing the bale on end as a part of the "beaming up" procedure. In carrying out this operation libelant and his partner assumed a kneeling position at either end of the bale to be rolled. Each man then hooked a large hook resembling a barbless fishhook in a part of the bale near the floor and on signal the partners would lift with the hooks and roll the bale forward. Libelant, who was five feet five inches tall, claims that when he was in the position taken at the start of this operation the top of his head was approximately four feet, five inches above the "floor" made up of bales of cotton already in place. As the bale was lifted and rolled forward libelant straightened up and raised his body some few inches in order to acquire the necessary leverage to move the bale. It was during this "lift and roll" process that libelant claims he struck his head on the overhead beam.

1. It is an established practice in the shipping industry to "beam up" cargo in a hatch in order to make the most efficient use of the available space. The term "beaming up" can apply to any cargo. In the instant case the term was used to describe the process whereby bales of cotton were stood on end on top of other bales which had been laid flat. This was done in order to take full advantage of the remaining stowage space and as completely as possible to fill the hatch.

2. Although libelant testified that three other employees were working with him, neither party called any of these persons as a witness at the trial.

It appears from libelant's testimony on cross-examination, however, that he may have been engaged in standing up the bale at the time of the accident. He testified in part:

"Q Are you familiar with a longshoreman's term called beaming up?

A We call it beaming up, yes.

Q What does that mean, sir?

A After rolling the cotton to the back we stand up the bales. That means beaming up.

Q That means standing them up next to the beam?

A Yes.

Q That is a pretty common term, is it not?

A Well, it is just a lingo for the longshoreman's language.

Q That is what I mean, it is longshoreman's language?

A Yes, we stand up the bales between the beams. That is the reason we call it beaming up.

Q And it is common enough to have a name so that you call it beaming up, is that right?

A Yes.

Q And would it be correct to say that is what you were doing at the time of this accident?

A Yes."

The steel beams, upon one of which libelant struck his head, were spaced at regular intervals across the top of the hatch and were somewhat over two feet apart. The base or lowermost part of the beams was approximately eight inches in diameter. The beams were a regular part of the structure of the NEVADA MARU and were clearly visible to libelant or anyone else working in the hatch.

According to libelant's testimony, the area in which he was rolling the bale at the time of his injury had been "floored off" by bales of cotton laid flat, leaving a space of about four feet from the "floor" of the bales up to the lowermost point of the overhead beams. The beams themselves, by his testimony, extended down some 18 inches from the top of the overhead, thus making a total space of approximately five and one-half feet between the beams in which the bales were being "beamed up". Libelant did not offer any evidence on the total distance from the deck of the hatch up to the bottom of the overhead beams.[3]

Lee Holdridge, a longshoreman of 29 years experience, who was serving as hatch boss at the Number 3 hatch on the NEVADA MARU and was libelant's immediate supervisor at the time of the accident, testified for the respondent. While he did not witness the accident, he did describe the work area in the Number 3 hatch and the manner in which the cotton was being stowed. He stated that the distance from the deck of the hatch to the bottom of the overhead beams was approximately seven feet six or eight inches, and that the beams themselves extended down about eight inches from the top of the overhead.[4] Thus, the total height of the hatch would have been about eight feet two to four inches.

It was Holdridge's best recollection that a process known as "one down and one up" was being used to stow the cotton in the 'tween deck area of the Num-

---

3. To illustrate libelant's testimony, there was received in evidence a drawing which shows a distance of five and one-half feet from the "floor of the bales" to the top of the hatch. It shows the beams extending one and one-half feet from the top of the hatch, leaving four feet between the floor and the bottom of the beams. The drawing does not show the distance from the deck of the hatch to the floor made by the bales of cotton or the distance from the deck to the top of the hatch. This drawing was prepared by libelant from three to five days before the trial and was based on his recollection of the measurements.

4. According to Holdridge, the so-called "combing" portion around the square of the hatch and supporting the deck above it extends down somewhat lower—some 16 or 18 inches. The supporting beams, however, hang down approximately 8 inches.

ber 3 hatch,[5] and that on the day before the accident the crew had floored off the stowage area with one layer of bales. This latter fact is corroborated by the libelant's testimony. According to Holdridge, on the morning libelant was injured the crew was "beaming up" the remaining bales so that they stood on end *below* and not *between* the overhead beams.

In my opinion the evidence given by Holdridge presents the more accurate picture of the area in which libelant was working and of the manner in which the cotton was being stowed in the wings. Holdridge had worked on the NEVADA MARU many times over a period of years and was familiar with the area in which libelant was injured, whereas by his own testimony libelant had not worked on or visited the NEVADA MARU since the day of the accident.

The accuracy and plausibility of Holdridge's description of the work area and loading method become more apparent upon comparison of the two versions in light of the size of the bales of cotton being handled. Using the "one down and one up" method as the basis for computation it is apparent that the first layer of bales laid flat would have taken up approximately two feet of the available stowage space. When the second layer of bales was stood on end on top of them five more feet or a total of seven feet of the stowage space would have been filled. If Holdridge's measurements of approximately seven and one-half feet from the deck to the bottom of the beams is accepted, the balance of his description of the operation that the bales were being "beamed up" under and not between the beams is borne out. With the "one down and one up" bales taking up approximate-

ly seven feet, only about six inches of space would have remained below the bottom of the beams.

Holdridge testified on cross-examination that a process of "two down and one up" [6] was often used in storing cotton on vessels similar to the NEVADA MARU. I do not recall any positive testimony from libelant that this method was used; and as noted supra, neither his oral testimony nor his drawing showed the height of the bales. The argument of counsel for libelant, however, referred to two bales down instead of one.[7]

In any event, if Holdridge's measurements are accepted it would have been impossible to have utilized the "two down and one up" method in the 'tween deck area of the Number 3 hatch. The two bales down would have required a total of four feet of the seven and one-half feet of space available below the bottom of the beams. And, even if the additional eight inches which the beams extended down into the stowage area is added to the remaining three and one-half feet there still would not have been sufficient space in which to stand up a five foot long bale between the beams.

As stated above, Holdridge's testimony with respect to measurements and method of loading is more persuasive, and accordingly I find:

1. The work area in which the libelant was working at the time of his injury was approximately seven feet, six to eight inches from the deck of the hatch up to the bottom of the overhead beams.

2. The beams themselves extended down from the top of the overhead approximately eight inches.

5. The "one down and one up" method of stowage is carried out by first laying one layer of bales down flat and next standing the second layer on end on top of the down bales.

6. The "two down and one up" stowage method is similar to the "one down and one up" except that two layers of bales

are laid flat before the third layer is stood on end and on top of them.

7. As noted supra, the witnesses agree that it required one entire day to lay the first layer of bales. It hardly seems probable that a second layer had been placed on top of the first layer and the "beaming up" of a third layer was under way by 10:30 A.M. of the second day.

3. The total distance from the deck to the top cf the overhead was approximately eight feet, two to four inches.

4. The longshoremen with whom libelant was working in loading the cotton into the stowage area at the Number 3 hatch were employing the "one down and one up" method, which under the circumstances would have made the most efficient use of the available stowage space.

5. The space in which libelant was working at the time of his injury measured some five and one-half feet from the floored off layer of cotton below up to the bottom of the overhead beams.

■ We turn now to the rules of law covering liability of a shipowner for injuries to a longshoreman resulting from the unseaworthiness of a vessel upon which the longshoreman is working. It is well settled that if the vessel is unseaworthy the liability is absolute and nondelegable. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Titus v. The Santorini, 9 Cir. 1958, 258 F.2d 352. The obligation is neither limited by conceptions of negligence nor is it contractual in nature. Seas Shipping Co. v. Sieracki, supra; Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941. It is no defense to the shipowner that the vessel had been turned over to a stevedoring company and that it, rather than the shipowner, brought about the unseaworthy condition. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming 9 Cir., 205 F.2d 478; Blassingill v. Waterman S.S. Co., 9 Cir. 1964, 336 F.2d 367. Moreover, unseaworthiness can result from a temporary as well as a permanent condition. Mitchell v. Trawler Racer, Inc., supra.

■ It now appears well settled by the Supreme Court and the Court of Appeals for the Ninth Circuit that unseaworthiness can result from the adoption of a course of conduct in the loading or unloading of a vessel which creates a dangerous condition for those working on board. Morales v. City of Galveston,

370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412; Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297; Blassingill v. Waterman S.S. Co., supra.

■ While the duty of the shipowner to furnish a seaworthy vessel is absolute, it does not follow that the mere fact that there was an accident is sufficient to establish unseaworthiness and consequent liability. As the Court said in Mitchell v. Trawler Racer, Inc., supra:

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." 362 U.S. at 550, 80 S.Ct. at 933.

In elaborating upon this same test Judge Weinfeld of the Southern District of New York stated:

"The ultimate question is—was she reasonably fit to permit libelant to perform his task with reasonable safety. * * * Whether or not the shipowner has measured up to that duty is determined by the trier of the fact upon all the evidence of a given case and not by the standards set by industry practice." Rodriguez v. Coastal Ship Corp., S.D. N.Y., 1962, 210 F.Supp. 38, 43.

There is little, if any, dispute with respect to the present state of the law, as established by the foregoing decisions. Serious questions arise in applying these principles to the facts of this case.

■ Libelant contends that the area in which he was working was so dangerously confined and restricted that NEVADA MARU was thereby rendered unseaworthy. He does not contend that the overhead beams in the 'tween deck area of the Number 3 hatch per se made

the vessel unseaworthy. Rather he argues that the method by which the cotton was being stowed in the wings forced him to work in such close proximity to the beams that a dangerous condition was created which made the ship unseaworthy.[8]

Libelant relies strongly on Blassingill v. Waterman Steamship Corporation, supra, but factually that case is clearly distinguishable. The court there recognized the rule, as the court does here, that an improper or an unsafe method of handling or loading cargo can amount to unseaworthiness. The court held that the trial court "should have told the jury, in substance, that the employment of an unsafe method of unloading would render the vessel 'unseaworthy.'" (336 F.2d at 368). All instructions of this nature offered by the libelant had been refused. In that case bales of burlap were being hoisted from the hatch. The bales were raised from the hold by a single wire rope sling, in which they were placed. During the first three quarters of an hour two bales at a time were placed in the sling. Thereafter, upon order of the hatch boss and over the workmen's protest, four bales were lifted at a time. A load fell out of the sling and Blassingill was injured. As the court said, "Putting two bales in the sling was a safe method of unloading them. Putting four bales in the sling was not." (336 F.2d at 369).

There is no evidence that the method used in this case was in itself improper or unsafe. Nor is it contended that the beams themselves rendered the vessel unseaworthy. Rather libelant contends that the combination of the method and the beams resulted in a dangerously confined and restricted condition.

As I view the evidence, I cannot conclude that libelant was not furnished with a reasonably safe and fit place in which to work. If we assume, as I find, that the beam extended down approximately eight inches instead of 18 inches, then under libelant's measurements, there would have been four feet ten inches from the floored layer of cotton bales upon which he was standing and working to the bottom of the overhead beams. Under Holdridge's testimony, which I find more plausible, there would have been approximately five feet six inches. This, in my opinion, afforded libelant ample space in which to have a "reasonably fit" place in which to perform his duties as a longshoreman. I conclude that the NEVADA MARU was seaworthy within the meaning of that term as defined and interpreted by the Supreme Court and the Court of Appeals for the Ninth Circuit.

The findings and conclusions herein set forth may be considered as findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, although counsel for the defendant may, if they so desire, submit formal findings of fact and conclusions of law consistent with this opinion. Defendant will also prepare, serve and lodge form of judgment.

8. Counsel for libelant in his closing argument said in part:
"It is not our case that the existence of those protruding beams per se, those beams coming down rendered this unseaworthy. Every ship has them. We accept that they have them, and that is not our claim. All our claim is that the layer of the cotton, the gear and the appurtenances of the vessel was such that the libelant was forced to work in such close proximity to those beams he was not furnished a seaworthy vessel."