James E. GRANT

v.

CIA ANONIMA VENEZOLANA de NAVEGACION

v.

J. P. FLORIO & COMPANY, Inc.

No. 5113.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 13, 1964.

Dudley Phillips, Jr., and A. R. Occhipinti, Occhipinti, Occhipinti & Phillips, New Orleans, La., for libellant.

James G. Burke, Jr., and Leon Sarpy, Chaffe, McCall, Phillips, Burke, Toler &

Hopkins, New Orleans, La., for respondent.

A. R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for respondent-impleaded.

FRANK B. ELLIS, District Judge.

This case is another in the eternal triangle of longshoreman versus shipowner, and shipowner versus stevedoring company.[1] Respondent, Cia Anonima Venezolana de Navegacion, is the owner and operator of the M/V NEUVA ESPARTA, a motor vessel of Venezuelan registry, of 5016 gross tons. She has four hatches, three of which are forward of the midships housing and one aft.

The M/V NEUVA ESPARTA arrived in New Orleans on the morning of February 17, 1961, and tied up at the Third Street Wharf, starboard side to the wharf. Shortly thereafter, employees of respondent-impleaded, J. P. Florio & Company, Inc., a master stevedore, boarded the vessel, and, after rigging the ship's cargo gear, commenced loading general cargo in all hatches.

Work continued throughout the day without incident, except for work stoppages due to the meal hour and rain. At 1800 hours a night gang relieved the day gang in the Number 3 lower hold and continued the loading of 100-pound sacks of soy bean meal in the after end. In a typical loading operation of sacked material in the Port of New Orleans sacks of grain are stacked on pallet boards and brought aboard the vessel using the ship's cargo gear.

To load the cargo the port boom serving the after end of the Number 3 hatch was spotted over the outboard (port) hatch coaming. The overside (starboard) boom was spotted over the apron of the wharf.

The falls of the two after booms were married together and a bridle bar rig attached to the falls. The bar is a steel rod about 4 or 5 feet long. At each end are wire ropes leading to a hook at the end of the falls. There are two such bars, one for each side of the pallet board, and four wire ropes (bridles). The entire assembly is called the bridle bar rig.

Two winches serve the after end of the Number 3 hatch. The winch serving the hold boom (port) controls the vertical and port movement of cargo; the winch serving the overside boom (starboard) controls the horizontal and starboard movement. The port winch was operated by A. Davis and the starboard winch was operated by Anderson Todd.[2]

There are times when the winch operators cannot see into the holds of the vessel either due to the position of the winches or due to loading or unloading operations in the deep tanks or lower holds of the vessel. The loading operation in Number 3 hatch was such that neither winch operator could see into the hold.

Under such conditions an employee with the job title of "derricksman", commonly referred to as a "Dutchman", becomes the eyes of the winch operators. The derricksman on this occasion was Bertrand Mitchell.

Mitchell's duties were to stand near the hatch coaming and give the winch operators hand signals for the vertical or horizontal movement of the bridle bar rig when cargo is being lowered into the hold. When the bridle bar rig was on the wharf's apron his duties are to stand near the ship's rail and give hand signals.

Libellant, James E. Grant, was assigned to the inshore (starboard) side

1. Feinberg, J., in Simpson v. Royal Rotterdam Lloyd, S.D.N.Y., 225 F.Supp. 947.

2. On oral deposition taken by respondent on November 16, 1962, Anderson Todd testified that he was operating the port (offshore) winch and that Davis was operating the starboard (inshore) winch.

"Bertrand Mitchell, the derricksman, testified similarly in his deposition taken on the same date. Todd further testified in his deposition that the winch 'cut out' and an electrician came and fixed it. In trial Todd testified that he was operating the starboard winch and that he had had no trouble with it."

of the lower hold, Number 3 hatch, and at approximately 1830 hours was seriously injured when struck in the back with the bridle bar rig.

Just prior to the accident the bridle bar rig was on the offshore (port) side of the hatch. For some reason the bridle bar rig swung to starboard across the deck of the lower hold.

Conflicts of testimony bear out the reason for the bridle bar rig swinging from the offshore (port) side of the hatch to the inshore (starboard) side and striking libellant.

One theory is the bridle bar rig was being transferred from one side to the other and that libellant's injuries were proximately caused by the negligence of a fellow-employee, with no apparent unseaworthiness on the part of the vessel or negligence on the part of the shipowner. This, in essence, is the respondent's case.

Another theory is that the winches had been failing prior to the accident; that on this one occasion when the bridle bar rig was on the offshore (port) side of the hatch an attempt was made to bring it up and out of the hatch over to the wharf's apron; that in so doing the offshore (port) winch failed and the inshore (starboard) winch, which controls the starboard horizontal movement of the bridle bar rig, continued in operation causing it to swing across the deck, strike libellant and inflict the injuries he ultimately sustained. This, in essence, is libellant's case.

There is positive testimony in the record to the effect that the winches on the M/V NEUVA ESPARTA were electrically operated. Witnesses with decades of experience on the waterfront testified that an electrical winch system is known to "cut out". All of the witnesses for libellant positively and emphatically stated that the M/V NEUVA ESPARTA had an electric winch system.

The Court is satisfied, from the testimony in the record, that it is possible for an electrical winch system to cut out sporadically.

However, there is no such thing as an electrical winch system on the M/V NEUVA ESPARTA. Stanley M. Le-Court, an expert testifying for respondent, stated that his examination of the aft winch system of the Number 3 hatch reveals that they are hydraulically operated. He testified that both winches operated from the same source of hydraulic power.

He further testified that, while it may be possible for an electrical winch system to cut out periodically and sporadically, it is virtually impossible to have one hydraulic winch cut out and not the other. The reason for this is that both winches operate from the same power source; when one fails the other automatically fails and the failure of both is instantaneous.

Respondent also introduced the deposition of Miguel Trinidad Vivas, port engineer for the Venezuelan Line. Mr. Vivas testified that the winches aboard the M/V NEUVA ESPARTA are the same winches that were placed aboard when the vessel was originally built and that there has been no change in the winch system from that date until the present.

Thus stated the Court is presented with a direct conflict of testimony.

Libellant's witnesses testified that the winches were electrically operated and that they were prone to cutting off. One of libellant's witnesses testified that it was impossible for a hydraulic winch system to cut out.

Respondent's expert who made a physical inspection of the vessel, found that the winches serving the No. 3 hatch were powered by hydraulic fluid from a single hydraulic pump located in the engine room of the vessel. The hydraulic pump is powered by a constant speed electrical motor. It indubitably follows that an interruption of the initial electrical energy would affect both winches simultaneously. Since it has been shown to the complete satisfaction of this Court that the system was hydraulic and that the winches serving the after end of the

No. 3 hatch were powered by the same hydraulic pump there could not have been a failure of one winch while the remaining winch continued to operate as the libellant would have this Court believe.

■ Under the "physical facts rule" oral testimony of a witness may be disregarded when positively in contradiction to the physical facts, Whittington v. Mayberry, 10 Cir. 190 F.2d 703. The doctrine should be applied only where the evidence on which plaintiff relies is clearly contrary to some immutable law of physics or is hopelessly in conflict with one or more established and uncontroverted physical facts, Travelers Indemnity Company v. Parkersburg Iron & Steel Company, 4 Cir. 70 F.2d 63; Jarman v. Philadelphia-Detroit Lines, 4 Cir. 131 F.2d 728; Kansas City Public Service Company v. Shephard, 10 Cir. 184 F. 2d 945, and its use should be restricted to those situations in which the testimony of the witnesses relied upon was virtually impossible on the uncontradicted physical facts, Granat v. Schoepski, 9 Cir. 272 F.2d 814.

■ Libellant's witnesses are wholly disinterested and, ordinarily, their testimony should not be disregarded, Chesapeake & Ohio Railroad Company v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501; Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; unless it has to give way in the face of overpowering physical facts, or other evidence which simply makes it incredible or inherently improbable, Cf. Geigy Chemical Corporation v. Allen, 5 Cir. 224 F.2d 110.

■ The Court is of the opinion that this case cries out for the application of the physical facts doctrine and will proceed to do so without the imputation of false testimony upon the part of any of the witnesses.

■ It is a matter of common knowledge to those familiar with stevedoring operations in the Port of New Orleans that quite frequently each day's labor will find the individual longshoreman on a different vessel. It is also a matter of common knowledge that most of the dry cargo carriers calling at this port are very similar in naval architectural construction and that the winch systems of each may vary from vessel to vessel.

One can hardly expect an elephantine memory from semi-literate men of labor. Lapses of memory and confusion may be expected, especially in a case tried three years after the occurrence in question.

Many of the witnesses were confused and befuddled, making statements from the witness stand that were entirely inconsistent with prior statements upon oral deposition. Testimony that the winch system aboard the M/V NEUVA ESPARTA was electrical when in truth it was hydraulic, may be attributed either to poor memory, lack of a formidable knowledge of a winch system and what makes it tick, or confusion with any one of several hundreds of vessels the witness may have worked aboard in the past.

This brings us to the proximate cause of the accident. How does one explain the sudden swinging of the bridle bar rig from port to starboard in the lower hold of the Number 3 hatch?

The Court finds that the only logical explanation of the occurrence, in the light of all the testimony, is that of human error; negligence on the part of a fellow employee in putting the inshore (starboard) winch into operation thus causing a horizontal movement of the bridle bar rig, or, inattentiveness on the part of the offshore (port) winch operator in not putting the port winch in operation when both operators were signalled to raise the bridle bar rig.

■ The Court finds that the proximate cause of the accident was improper use of seaworthy equipment by fellow employees of libellant and, consequently, the evidence cannot support a claim of unseaworthiness on the part of the vessel, Neal v. Lykes Brothers Steamship Company, 5 Cir. 306 F.2d 313.

**236**

The Court also finds that the hydraulic winch system of the M/V NEUVA ESPARTA was seaworthy in all respects and reasonably fit for its intended purpose, Mitchell v. Trawler Racer, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941.

If the vessel owner and stevedores are unable to agree on the quantum of attorney's fees and costs incurred by respondent in the defense of this libel, the matter will be re-opened for further hearing solely on this issue. It would appear, however, that any questions in this matter have been laid to rest in Strachan Shipping Company v. Koninklyke Nederlandsche, 5 Cir. 324 F.2d 746, cert. den. 1964, 84 S.Ct. 969.