Andrew **NICHOLSON**, Libellant,

v.

**AURORA SHIPPING CORPORATION**, in **Personam, and S. S. NAUSICAA,** in **Rem et al., Respondent and Impleading Petitioners,**

v.

**CROWN STEVEDORING COMPANY,** Impleaded Respondent.

No. 63–H–83.

United States District Court S. D. Texas, Houston Division.

Sept. 21, 1966.

Mandell & Wright, Arthur J. Mandell, Houston, Tex., for libellant.

Royston, Rayzor & Cook, E. D. Vickery, Houston, Tex., for respondent and impleading petitioners.

Fulbright, Crooker, Freeman, Bates & Jaworski, S. G. Kolius, Houston, Tex., for impleaded respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NOEL, District Judge.

The above entitled and numbered cause having been tried before the Court without a jury, at the close of the evidence and after hearing arguments of counsel, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. On or about May 26, 1960, the SS MARY SOPHIA (later changed to SS NAUSICAA), was moored starboard side to the Manchester wharfs at Houston, Harris County, Texas, for the purpose of being loaded with, among other things, a cargo of scrap brass.

2. Respondents, Aurora Shipping Corporation and Compagnie Maritime des Charteurs Reunis, were at all times material hereto owners and/or operators of the vessel.

3. The SS MARY SOPHIA was at all times material hereto a merchant vessel used in the transportation of cargo to and from the United States and foreign ports.

4. The Manchester wharf where the vessel was moored, is upon, over or above navigable waters of the United States. Said wharf is erected on pilings and concrete blocks which rest on the bed of the navigable waters of the United States. The inshore edge of the wharf is attached to the outboard edge of a warehouse, a portion of which likewise is under, over or above navigable waters of the United States.

5. On May 26, 1960, a gang of longshoremen in the employ of the impleaded respondent, Crown Stevedoring Company, with which the vessel owner had contracted for stevedoring services, came aboard to load scrap brass in bales in the vessel's number three hatch at 7 a. m.

6. Libellant Andrew Nicholson was a member of this longshore gang and was assigned to work on the dock. All of his work on the day of his injury was done and performed on the dock, except for an approximate 20-minute period during which he relieved one of the winch operators aboard the vessel.

7. The gangs are formed at the Union Hall. Any time a gang is formed to work general cargo, some members of the gang may work on the vessel and some on the dock. The individual members of the gang do not know before reaching the vessel whether the work assignment is to be on the dock or on the vessel. After the gang reaches the vessel, they learn what work is to be done and the work assignment is then given. Except for the foreman, there is no difference in the rate of pay for the gang, whether they are working on the vessel or on the dock.

8. The Manchester wharf, at the place where the vessel was moored, is a concrete structure, with the navigable waters of the Houston Ship Channel running underneath it. A railroad track with spurs on it runs down the approximate middle of it and for its entire length. Railroad cars are moved and

switched up and down the wharf for the purpose of taking cargo to and from vessels moored at the wharf. The surface of the wharf is rough and is pitted with holes.

9. During periods of loading, it is common practice for any vessel to have one of its officers on duty observing the loading operation. On the morning of May 26, 1960, the mate on duty directed the gang of longshoremen to remove two large hatch · beams and place them on the wharf beside the vessel. This was accomplished by the longshoremen by use of the winches at the number three hatch.

10. The two beams were placed on the wharf in the following manner:

A wooden pallet, generally used for picking up cargo, was laid on the dock and one of the beams was placed on its side on top of that pallet. Another pallet was then placed immediately on top of the beam, and the second beam placed on top of it in sandwich-like fashion.

11. Neither the mate on duty nor any other member of the vessel's crew directed the longshoremen as to the manner in which these beams were to be placed on the wharf.

12. Some time between 10:00 and 10:30 a. m., the mate on watch advised the longshoremen that the vessel was to be shifted further up the wharf and directed that the beams be moved from the place they were then located to a position further up the wharf where the vessel was to be shifted. Upon receiving such instructions, the foreman directed John Rylander, the forklift operator, to get two more pallets and put one at each end of and underneath the lower beam. The foreman then called Donald C. Williams out of hatch number 3 where he was working, and instructed him to man a second forklift and help move the beams further up the wharf where the vessel would be shifted.

13. Pursuant to such instructions, Donald Williams obtained the second forklift and positioned himself at the aft end of the beams, placing the forks of the lift into the pallet in a position to lift and push the beams up the wharf. John Rylander, in a like manner, positioned his forklift at the forward end of the beams, backing up while Williams was coming forward.

14. During this procedure the mate on watch was standing on the vessel looking directly at the area where the moving operation was going on. As the moving of the beams proceeded, Andrew Nicholson walked forward of the forward lift to prevent persons, vehicles and trucks from coming toward the area where these beams were being transported and to stop persons and traffic from coming out of the open doors of the warehouse.

15. In transporting the beams to the area where the ship was to be shifted, the forklifts crossed the railroad track. Libellant stationed himself at the opening of one of the open doors leading out of the warehouse and, with arms outstretched, stopped traffic coming out of the warehouse toward the area where the beams were being transported. At or about the time the load passed libellant, the top beam, laying as it was on only one pallet, toppled over, falling upon libellant and seriously injuring him.

16. The character of the work done by libellant at the time he was injured was in connection with the loading of the cargo of the SS MARY SOPHIA, and in its service.

17. The method of transporting and/or moving the two beams at one time, with only one pallet positioned in the center of the beam, created a dangerous condition resulting in libellant's injuries.

18. When beams are removed from a vessel and placed on a wharf, if the vessel is to be shifted, the beams generally are placed back on the vessel and then removed again after the vessel has been moored at its new position. If not so done, permission of the vessel's mate on duty must be obtained before the vessel's hatch beams are shifted from one place on the wharf to another.

19. The vessel's mate on watch, who observed the moving of the beams from the rail of the vessel, took no action to prevent the dangerous method of moving the beams employed by the stevedore.

20. I find from the above facts that respondents were negligent in

(a) Failing to stop the moving of two beams with only one pallet between them.

(b) Failing to provide libellant with a safe place in or on which to do his work.

21. I find that respondents, through their agents, servants and employees, knew or should have known that the stevedore's method of moving the beams did not conform to the standard of reasonable care, and their failure to correct this method constitutes negligence.

22. I find each act of respondents' negligence to have been a proximate cause of the injuries sustained by libellant on May 26, 1960.

23. I find all ship's gear, including but not limited to the pallets and fork-lifts used by the longshoremen to move the hatch beams, to have been reasonably fit for its intended use. I find the vessel unseaworthy, however, due to the improper or negligent use, as found herein, of the ship's otherwise fit equipment, and that this unseaworthiness was a cause of libellant's injuries sustained on May 26, 1960.

24. The impleaded respondent's longshoremen, including libellant, were negligent in attempting to move the beams down the dock in an improper and unsafe manner, and such negligence was a proximate cause of libellant's injuries. This negligence also constitutes a breach of the impleaded respondent's implied warranty of reasonably safe and workmanlike service made to the respondents and the vessel. This negligence of the longshoremen is imputed, of course, to impleaded respondent.

25. The libellant was guilty of additional acts of negligence which were proximate causes of his injuries, in failing to keep a proper lookout for his own safety, and in standing in such a position that he would be struck by the beam or beams if they fell off the pallet when he knew the forklifts would have to cross the railroad tracks on the wharf. Libellant was an experienced longshoreman and a load precariously constructed as here should have excited his interest for his own safety and he should have positioned himself in some fashion so as to avoid the possibility of injury.

26. I find that the negligence of the libellant contributed fifty percent (50%) to the cause of his injuries.

27. Respondents were not guilty of such conduct as to preclude their right to recover indemnity from impleaded respondent. Impleaded respondent's negligence was the *active* cause of the accident which brought respondent's negligence and the unseaworthy condition of the vessel into play.

28. I find that libellant, as a result of this accident, has incurred medical expenses in the total amount of $13,719.-78.

29. I find that libellant, as a result of this accident, has sustained a total loss of earnings, past and future, in the amount of $78,000.00.

30. I find that libellant is entitled to compensation for pain and suffering, past and future, in the total amount of $60,000.00.

*Conclusions of Law*

1. This Court has jurisdiction over the parties and over the subject matter of this suit. Gutierrez v. Waterman Steamship Corp. 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Seas Shipping Co. v. Sieraki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

2. Respondents are liable, under general negligence concepts, for permitting a dangerous condition emanating from the vessel to arise at the place where libellant was injured, even though it lacked control or right of control over the wharf itself. Hagans v. Ellerman & Bucknall Steamship Co., 318 F.2d 563 (3d Cir. 1963). Control of the impact zone is not essential for negligence. Gutierrez v. Waterman Steamship Corp.,

373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). Here, the vessel's mate knew or should have known that the methods chosen by the longshoremen to move the hatch beams did not conform to a standard of reasonable care. As stated in Ferrante v. Swedish American Lines, 331 F.2d 571 (3d Cir. 1964):

"Where a ship knows, or should have known, that the stevedore's method of discharging its cargo does not conform to the standard of reasonable care, and thereby creates a hazardous condition, the ship is negligent when it does not forbid the use of the method."

■ 3. While the Supreme Court has not yet spoken on the precise question as to whether negligent use of a ship's seaworthy equipment renders the ship unseaworthy, it is the opinion of this Court that under conditions such as here there can be no reasonable doubt but that it does. See: Ferrante v. Swedish American Lines, supra; Scott v. Isbrandtsen Co., 327 F.2d 113 (4th Cir. 1964); Candiano v. Moore-McCormack Lines, Inc., 251 F.Supp. 654 (S.D.N.Y. 1966).

The seeming inconsistency in results reached by different Courts when presented with this question may be reconciled in terms of *causation*. Precisely in point is the following language found in Judge Hay's concurring opinion in Puddu v. Royal Netherlands Steamship Co., 303 F.2d 752, at page 757 (2d Cir. 1962) (per curiam in banc), cert. denied 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed.2d 75

"Perhaps the best that can be done is, like Judge Hand in Grillea v. United States, 232 F.2d 919 (2d Cir. 1956), to take as the starting point a condition of reasonable fitness for intended use, to consider this condition as impaired by the conduct or process which is the subject of litigation, and to call the resulting condition 'unseaworthiness.' The conduct or process by which the fitness is changed to unfitness is not then to be classified as itself constituting unseaworthiness.

"A ship is not unseaworthy because it has glass in a window which might be broken. The injuries of a seaman who negligently breaks such a glass are not the result of unseaworthiness, nor are the injuries of a seaman who is cut by the falling glass. But injury incurred in stepping on the broken glass does result from unseaworthiness.

"The rule is far from satisfactory, but it has the virtue of being possible, though not easy, of application, and of having behind it the authority of a great judge. The situation itself does not permit the formulation of a really satisfying rule."

Thus, had libellant's injuries been caused by a mishap which occurred during the actual building of the improperly constructed load, there would then be no unseaworthiness. It was on facts similar in material respect to the above hypothesis that the shipowners were exonerated from allegations of unseaworthiness in Grant v. Cia Anonima Venezolana de Navegacion, 228 F.Supp. 232 (E.D.La.1964), affirmed 5 Cir., 343 F.2d 757; and McQuiston v. Freighters & Tankers Steamship Co., 217 F.Supp. 701 (E.D.La.1963), affirmed 5 Cir., 327 F.2d 746.

The decision handed down by the Court of Appeals for the Fifth Circuit in Neal v. Lykes Bros. Steamship Co., 306 F.2d 313 (1962), is of no persuasion here, as the Court there merely affirmed a jury finding that negligence of the gang foreman was the sole proximate cause of the injury, thus rendering further inquiry concerning unseaworthiness irrelevant.

These findings supersede in all respects my tentative views expressed in open court at the close of evidence and argument on liability.

■ 4. Respondents and impleading petitioners are not guilty of conduct such as to preclude their right to recover indemnity from impleaded respondent. Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413

(1959). The validity of this finding is unaffected by the fact that the ship has been found negligent due to its failure to stop the unsafe method of moving the beams adopted by the longshoremen. As stated in Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956):

> "Petitioner suggests that, because the shipowner had an obligation to supervise the stowage and had a right to reject unsafe stowage of the cargo and did not do so, it now should be barred from recovery from the stevedoring contractor of any damage caused by that contractor's uncorrected failure to stow the rolls 'in a reasonably safe manner.' Accepting the facts and obligations as above stated, the shipowner's present claim against the contractor should not thereby be defeated. Whatever may have been the respective obligations of the stevedoring contractor and of the shipowner to the injured longshoreman for proper stowage of the cargo, it is clear that, as between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense. Respondent's failure to discover and correct petitioner's own breach of contract cannot here excuse that breach."

5. Respondent Aurora Shipping Corporation, claimant-respondent Compagnie Maritime des Chargeurs Reunis, and the SS MARY SOPHIA, now named the SS NAUSICAA, are entitled to recover indemnity from impleaded respondent Crown Stevedoring Company.

6. The amount of damages to which respondent, claimant-respondent, and the SS MARY SOPHIA, now named the SS NAUSICAA, are entitled to recover on their indemnity action is to be determined at a later date if not agreed upon by the parties.

7. Libellant is entitled to recover from the respondents Aurora Shipping Corporation et al., the sum of Seventy-Five Thousand Eight Hundred Fifty-Nine and 89/100 Dollars ($75,-859.89), with interest thereon at the rate of six percent (6%) from the date of judgment until paid.

Proctor for libellant shall prepare and submit to the Court, after first affording proctors for all other parties the opportunity of inspection, an appropriate form of judgment to conform to these findings and conclusions.