**A. Edward SOUSA**

v.

**M/V CARIBIA, her engines, tackle apparel and furniture**

v.

**GLOUCESTER STEVEDORING COMPANY.**

**Civ. A. No. 70–765.**

United States District Court,
D. Massachusetts.

June 25, 1973.

Kaplan, Latti & Flannery, Michael B. Latti, Boston, Mass., for plaintiff.

Bingham, Dana & Gould, Robert J. Hallisey, Bertram E. Snyder, Boston, Mass., for defendant M/V Caribia.

Parker, Coulter, Daley & White, Thomas R. Morse, Jr., Boston, Mass., for Gloucester Stevedoring Co.

## OPINION

JULIAN, Senior District Judge.

This action was tried to the Court without a jury on the complaint of A. Edward Sousa, seeking damages for personal injuries he sustained aboard the M/V Caribia, a refrigerated cargo vessel, on June 4, 1969, while engaged as a longshoreman in unloading cargo at Gloucester, Massachusetts. The complaint alleged both negligence and unseaworthiness. Defendant Caribia impleaded plaintiff's employer, the Gloucester Stevedoring Company, seeking indemnity on the latter's warranty of workmanlike service.

On the basis of the evidence adduced at the trial, the Court makes the following findings of fact and conclusions of law.

### A. *Edward Sousa v. M/V Caribia*

On June 4, 1969, plaintiff was employed by Gloucester Stevedoring Company, which was in turn employed by the M/V Caribia to unload the vessel of its cargo of frozen fish in the port of Gloucester, Massachusetts. On that day, plaintiff, assigned to a work gang of twelve men, subdivided into groups of three, commenced work in No. 1 lower hold of the vessel at 8 a. m.

Located in the bottom flooring of No. 1 lower hold were four metal hatch covers, rectangular in shape and approximately two feet long, one foot wide. Each hatch cover was equipped with two round lifting rings, approximately two inches in diameter, which, when not in use, fit flush into recesses in the hatch cover. One of the lifting rings, however, in the hatch cover located between the after wall of the hold and the overhead hatch, through which loaded pallets of frozen fish cartons were removed by crane, was raised out of its recess by an accumulation of debris and ice so as to protrude above the surface of the cover.

At approximately 10 a. m. on June 4, 1969, James Verga, with whom plaintiff was working in the rear of the hold, noticed the raised ring, called it to plaintiff's attention, and then unsuccessfully attempted to depress the ring with the heel of his shoe. Verga next sought to remove the ice and debris from the recess with his fingers, and also with a stevedore's hook, but failed. The tem-

perature in the No. 1 lower hold that morning was about 0°F. The plaintiff himself tried to depress the ring by hitting it repeatedly, using his hook as a hammer. He did not succeed. Verga then reported the condition of the lifting ring to his superior, John Pomeroy, the "boss lumper," who was working as a "hatchman" on June 4, and asked Pomeroy to "get someone down here to fix it." Verga and Pomeroy were employees of the Gloucester Stevedoring Company. Pomeroy said he would "get somebody" and instructed the plaintiff and Verga to continue working.

At approximately 11 a. m., while carrying a 99-pound carton of frozen fish to a pallet, plaintiff tripped over the raised hatch-cover lifting ring, twisting his back, and dropped to his knees, still holding the carton. Three fellow stevedores, Verga, Daniel Arsenault, and Robert Horn, immediately came to plaintiff's assistance, relieving him of the carton and helping him up the ladder out of No. 1 lower hold.

There was no credible evidence that Pomeroy, after being informed of the raised lifting ring, reported the dangerous condition to the captain, or to any member of the M/V Caribia's crew, or to anyone else. In any event, no one arrived in No. 1 lower hold for the purpose of fixing the upright ring during the time—45 to 60 minutes—which elapsed between Verga's report to Pomeroy and plaintiff's accident.

Before tripping over the protruding ring, plaintiff had traversed the area of the hatch cover twenty to twenty-five times on the morning of June 4, 1969. Plaintiff testified, and the Court so finds, that he realized the ring constituted a hazard. Plaintiff continued unloading No. 1 lower hold, attempting to "work around" the raised ring.

As a direct result of tripping over the raised lifting ring, plaintiff suffered an injury to his back, specifically, a ruptured disc between the third and fourth lumbar vertebrae.

On June 5, 1969, plaintiff's personal physician, who testified at the trial, diagnosed the back injury as a lumbo-sacral strain, prescribed drugs to relax muscles and relieve pain, and recommended heat treatments. After several additional examinations—on June 9, 12, 16 and 19—plaintiff's physician referred plaintiff to a neurosurgeon. The neurosurgeon, who testified at the trial, examined plaintiff on June 21, 1969, at Salem Hospital, Salem, Massachusetts, and noted his "impression" that plaintiff suffered from a ruptured disc. Bed rest, but no medication, was prescribed.

Plaintiff continued to experience pain both in his back and left leg. On August 24, 1969, after several further examinations, plaintiff was admitted to Addison Gilbert Hospital, Gloucester, Massachusetts, for a myelogram test. The myelogram revealed a protruding ruptured disc between the third and fourth lumbar vertebrae. He was discharged from the hospital on August 28, 1969.

On September 7, 1969, plaintiff was again admitted to the Addison Gilbert Hospital, this time for a hemi-laminectomy (removal of layers of bone attached to the vertebrae by ligaments) and the removal of the ruptured disc. The operation took place on September 8. Plaintiff was discharged from the hospital on September 16, 1969.

On October 2, 1969, after a recurrence of intense pain, plaintiff was readmitted to the Addison Gilbert Hospital with a disc space infection. Plaintiff received intravenous antibiotic treatment for two weeks, as well as narcotic treatment for a more diffuse pain affecting both legs. He was discharged on October 25, 1969.

On November 6, 1969, plaintiff's neurosurgeon discovered the development of scoliosis, a protective reaction of the body characterized by a tipping and twisting of plaintiff's torso to open space for an irritated nerve in the lumbar region. On December 4, 1969, plaintiff, whose scoliotic condition had wors-

ened, was fitted with a shoulder-to-hip brace.

On February 26, 1970, plaintiff was advised by the neurosurgeon that he could return to work on a limited basis, but that he should wear his brace. On February 28, 1970, plaintiff began working half-time as a stevedore, wearing his brace. On June 17, 1971, plaintiff, complaining of recurrent and severe pain in his back and leg, was examined by the neurosurgeon, who diagnosed an irritation in the area of the first sacral vertebra caused by plaintiff's fall on June 4, 1969.

In the three years immediately preceding the year of the accident, plaintiff's earnings as a longshoreman were as follows:

```
1966 ..... $11,623
1967 ..... 9,885
1968 ..... 14,355
```

During the first five months of 1969—the year of his injury—plaintiff earned $7,574, but was incapacitated for work by his injury for the remainder of 1969.

Plaintiff's total incapacity for work continued during the first two months of 1970. Plaintiff worked during the remaining ten months of 1970 and his earnings for the ten months totaled $12,975.

Plaintiff continued to work as a longshoreman during the year 1971. His earnings for that year totaled $17,010.

Plaintiff has failed to prove by credible evidence that he has undergone any significant amount of pain and suffering after May 1970 as a result of the injury he sustained in the accident. No medication to relieve pain was prescribed for him after May 1970. No tenderness or spasm was found in his back when he was examined by a physician in April 1972. Plaintiff returned to work on February 28, 1970, and engaged in laborious longshoreman's work the remainder of that year. He contin-

ued to engage in strenuous longshoreman's work during 1971 and thereafter in 1972 to the time of the trial.

Nevertheless, on the basis of all the pertinent evidence, including the medical testimony, the Court finds that it is more probable than not that the plaintiff has sustained a partial permanent disability of approximately 20% as a result of his injury.

The Court finds on the basis of medical testimony that the strenuous work of a longshoreman will cause further harm to plaintiff's back. Plaintiff, however, has continued to do the physically exacting work of a longshoreman and has made no attempt to find employment that will place a less severe strain on his back. The Court finds that the plaintiff has failed to prove that it is more probable than not that he will require further surgery to his back in the future and that any such surgery would be the proximate result of the injuries he sustained in the accident.

■ As the proximate result of the injuries he received in the accident, the plaintiff has suffered and will suffer in the future total damages in the sum of $51,400. In arriving at this amount the Court has considered plaintiff's medical and hospital expenses; the periods of plaintiff's total disability in 1969 and 1970; his permanent partial disability of approximately 20% and the consequent diminution in his earning capacity; the fact that plaintiff's work life expectancy and life expectancy were, respectively, 23.2 years and 30.8 years as of the date of the accident, when he was 41 years of age; and, finally, pain and suffering.

The damages suffered by the plaintiff are subject to diminution in proportion to the amount of plaintiff's own contributory negligence as hereinafter stated.

■ There is no credible evidence in the case upon which to conclude that the owner, officers, or crew of the M/V Caribia knew, or reasonably should have known, of the raised position of the

hatch-cover lifting ring in No. 1 lower hold before plaintiff tripped over it. As to the second and alternative cause of action, viz., "negligence of those persons for whose actions the defendant is legally liable,"[1] plaintiff has failed to sustain his burden of proof by a preponderance of the credible evidence.

As to unseaworthiness, alleged as plaintiff's first cause of action, the Court concludes that the raised hatch-cover lifting ring in No. 1 lower hold constituted defective equipment which rendered the deck of No. 1 lower hold unfit for the purpose of discharging a cargo of frozen fish. The essence of the seaworthiness doctrine is that "things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). On the morning of June 4, 1969, the M/V Caribia was, therefore, unseaworthy. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). "[T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability . . . . What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549–550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). It is the shipowner's absolute and non-delegable duty to furnish all seamen and longshoremen a safe place in which to work. Seas Shipping Co. v. Sieracki, *supra*; Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

On the morning of June 4, 1969, No. 1 lower hold was not a safe place in which to engage in the work of unloading a cargo of frozen fish.[2]

Having found as a fact that plaintiff's injury was caused by his tripping over the raised lifting ring in No. 1 lower hold, and having determined that the raised lifting ring constituted an unseaworthy condition, the Court concludes that the unseaworthiness of the M/V Caribia on the morning of June 4, 1969, was a proximate cause of plaintiff's injury.

The fact that plaintiff had traversed the area of the hatch cover with the raised lifting ring twenty to twenty-five times on the morning of June 4, 1969, realizing that the ring constituted a hazard, in no way affects the shipowner's absolute duty to assure a reasonably safe ship for all who work on board. Recognizing that seamen and longshoremen are constrained "to accept, without critical examination and without protest, working conditions and appliances as commanded by [their] superior officers," the Supreme Court has declared that they are "not deemed to assume the risk of unseaworth[iness]." Mahnich v. Southern S.S. Co., *supra,* 321 U.S. at 103, 64 S.Ct. at 459; Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939). Assumption of risk is not a defense in personal injury actions by longshoremen. 46 U.S.C. § 688; 45 U.S.C. § 54. If, however, plaintiff failed to act with reasonable care under all the circumstances, including the hazardous condition of which he had actual knowledge, see Ktistakis v. United Cross Navigation Corp., 316 F.2d 869 (2d

---

1. Complaint, ¶ 9.

2. The Court's conclusion of unseaworthiness is reinforced by Longshoring Safety Regulation, 29 C.F.R. 1504.91(a), which provides that "[w]eather deck walking and working areas shall be kept reasonably clear of lines, bridles, dunnage and all other loose tripping or stumbling hazards." Violation of such regulation renders the ship unseaworthy, "and if such unseaworthiness was the proximate cause of the plaintiff's injury, it would also render the defendant shipowner liable." Provenza v. American Export Lines, Inc., 324 F.2d 660, 665 (4th Cir. 1965). See also Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958).

Cir.), appeal after remand, 324 F.2d 728 (2d Cir. 1963), cert. denied, 377 U.S. 915, 84 S.Ct. 1179, 12 L.Ed.2d 185 (1964), and such failure contributed to the cause of his accident, then the amount of consequential damages otherwise recoverable by plaintiff from the shipowner must be reduced in proportion to the degree of his own negligence. This rule of comparative negligence obtains even though, as here, liability is based solely upon unseaworthiness rather than negligence. See Seas Shipping Co. v. Sieracki, *supra*, 328 U.S. at 94, n. 11, 66 S.Ct. 872; Pope & Talbot v. Hawn, 346 U.S. 406, 415, 74 S.Ct. 202, 98 L.Ed. 143 (1953) (concurring opinion of Frankfurter, J.); Socony-Vacuum Oil Co. v. Smith, *supra*, 305 U.S. at 429, 59 S.Ct. 262; The Arizona v. Anelich, 298 U.S. 110, 122, 56 S.Ct. 707, 80 L.Ed. 1075 (1936), and cases cited. In the present case, the Court finds that plaintiff, in traversing an area he knew to be hazardous, failed to exercise that degree of care which a reasonably prudent man would have exercised under the circumstances.

Plaintiff failed to take reasonable precautions to avoid walking across the hatch cover that had the raised ring. He should have known that walking over that hatch cover while carrying a large, heavy carton in his arms involved an undue risk that he might trip on the ring, fall and suffer injury.

The Court finds that the plaintiff himself was guilty of negligence and that his negligence was a contributing cause of the accident. The Court fixes the proportion of plaintiff's contributory negligence at 40%. Accordingly, the total damages of $51,400 sustained by the plaintiff must be diminished by 40% of that amount or by $20,560.

The Court finds the defendant M/V Caribia liable to the plaintiff in the amount of $30,840.

As will hereinafter appear, the Court finds that Gloucester Stevedoring Company, third-party defendant, is liable to M/V Caribia for the entire amount of plaintiff's judgment against M/V Caribia. It has been stipulated by the parties (Exh. 1, par. 4) that the plaintiff has received benefits paid by Gloucester Stevedoring Company under the Longshoremen and Harborworkers' Compensation Act totaling $3,588.88, consisting of $2,630 in compensation benefits and $958.88 in medical benefits. Since the judgment recovered by the plaintiff against M/V Caribia must ultimately be paid by the Gloucester Stevedoring Company, the benefits that the latter has already paid to the plaintiff must be deducted from the damages the Court has awarded to the plaintiff against M/V Caribia. Therefore, the judgment to be entered for the plaintiff against M/V Caribia shall be for $27,251.12, that is, $30,840 less $3,588.88.

### M/V Caribia v. Gloucester Stevedoring Company

On June 4, 1969, third-party defendant Gloucester Stevedoring Company owed the shipowner the duty to perform the unloading operations on the M/V Caribia in a workmanlike manner. See Ryan Co. v. Pan Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Waterman Corp. v. Dugan & McNamara, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960). The stevedoring company's warranty of workmanlike service may be "breached when the stevedore's negligence does no more than call into play the vessel's unseaworthiness." Waterman Corp. v. Dugan & McNamara, *supra*, at 423, 81 S.Ct. at 201, citing Crumady v. The J. H. Fisser, 358 U.S. 423, 429, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). In the event of a breach of its warranty of workmanlike service, the stevedoring company is liable to the shipowner for the entire amount of the longshoreman's judgment against the shipowner, together with reasonable counsel fees and the reasonable costs of defending the suit. See Nicroli v. Den Norske Afrika-Og Australielinie Wilhelmsens Dampskibs-Aktieselskab, 210

F.Supp. 93 (S.D.N.Y.1962), aff'd 332 F. 2d 651 (2d Cir. 1964); DeGioia v. United States Lines Co., 304 F.2d 421 (2d Cir. 1962) and cases cited. Whether a hazard is created by the negligence of the shipowner or otherwise, the stevedoring company is liable to the shipowner if a workmanlike performance would have minimized, if not eliminated, the risk of injury. Crumady v. The J. H. Fisser, *supra*; Bertino v. Polish Ocean Line, 402 F.2d 863 (2d Cir. 1968).

 In the present case, Gloucester Stevedoring Company breached its warranty of workmanlike service. Plaintiff, as well as Verga and Pomeroy, the "boss lumper"—all employees of the stevedoring firm—knew of the existence of the raised hatch-cover lifting ring 45 to 60 minutes before plaintiff's accident.[3] "Knowledge of the existence of a dangerous condition by a member of a stevedoring gang is imputed to its firm, and the firm's subsequent failure to act is a breach of the warranty." Bertino v. Polish Ocean Line, *supra*, 402 F.2d at 866, citing Drago v. A/S Inger, 305 F.2d 139 (2d Cir. 1962); see also T. Smith & Son, Inc. v. Skibs A/S Hassel, 362 F.2d 745, 747 (5th Cir. 1966). Despite this knowledge, and despite the stevedoring company's obligation "to remove defects and dangerous conditions on vessels on which [stevedores] are employed and generally to see that the longshoremen work under reasonably safe conditions," Bertino v. Polish Ocean Lines, *supra*, 402 F.2d at 866, the dangerous condition of the hatch-cover lifting ring over which plaintiff tripped remained uncorrected. If the dangerous condition defied correction by the stevedoring company, then it was the duty of the stevedoring company to stop working, see Rederi A/B Nordstjernan v. Crescent Wharf & Warehouse Co., 372 F.2d 674 (9th Cir. 1967), or to "require it to be corrected by the ship's officers." T. Smith & Son, Inc. v. Skibs A/S Has-

sel, *supra*, 362 F.2d at 747; see also Smith v. Jugosalvenska Linijska Plovidea, 278 F.2d 176 (4th Cir. 1960); Santomarco v. United States, 277 F.2d 255 (2d Cir.), cert. denied sub nom. American Stevedores, Inc. v. United States, 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960). Yet Pomeroy, the "boss lumper," when informed of the dangerous condition of the lifting ring by Verga, instructed plaintiff and Verga to continue working. And there was no evidence that Pomeroy reported the condition of the ring to any of the ship's officers, much less "required it to be corrected by the ship's officers."

Having breached its warranty of workmanlike service, Gloucester Stevedoring Company is liable to the shipowner for the entire amount of the longshoreman's judgment against the shipowner.

 In its third-party complaint Caribia prays not only for indemnity but also "for all reasonable attorneys' fees, expenses and disbursements incurred in the defense of plaintiff's claim." The Court has conferred with counsel for Caribia and counsel for Gloucester on the matter of counsel fees and disbursements. Counsel for Caribia has submitted a detailed affidavit in support of his claim for "about $8,514.-50" for legal services plus disbursements of "about $1,628.75" or a total of $10,143.25. Counsel for the third-party defendant has submitted a detailed counter-affidavit in support of his opposition to Caribia's claim. He expresses the opinion that "a fair and reasonable charge for the defense of plaintiff's case cannot be more than twice what was charged by the third-party defendant's counsel [viz., $2,183.04] and certainly not more than $4,500.00." Upon consideration of the matter the Court finds that the fair and reasonable charges for legal services and disbursements for

---

3. "Knowledge of an employee of the stevedore will constitute notice to the employer, and the actual knowledge need not be that of a supervisory employee." T. Smith & Son, Inc. v. Skibs A/S Hassel, *supra*.

Caribia's defense are respectively $5,000 and $1,628.75, totaling $6,628.75.

In accordance with the foregoing findings and conclusions, it is ordered that judgment be entered for the plaintiff against M/V Caribia in the amount of $27,251.12 plus costs, and that judgment be entered for M/V Caribia against Gloucester Stevedoring Company in the amount of $27,251.12, plus $6,628.75 for counsel fees and disbursements, or for the total sum of $33,879.87.